Filed 5/31/18

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S095076 |
| v. | ) | |
| | ) | |
| RICHARD PENUNURI, | ) | |
| | ) | Los Angeles County |
| Defendant and Appellant. | ) | Super. Ct. No. BA189633 |
| _____ | ) | |

 A jury convicted defendant Richard Penunuri of the first degree murder of Brian Molina, Michael Murillo, and Jaime Castillo (Pen. Code, § 187, subd. (a); all statutory references are to this code unless otherwise specified) and conspiracy to commit the murder of Castillo (§ 182). He was also found guilty of the second degree robbery of Shawn Kreisher and Randy Cordero (§ 211) and assault with a firearm on Carlos Arias (§ 245). The jury found true the special circumstances of multiple murder (§ 190.2, subd. (a)(3)) and witness murder (§ 190.2, subd. (a)(10)). The jury also found true the enhancement that Penunuri personally used a firearm with respect to the robbery of Cordero, the assault with a firearm on Arias, and the murders of Molina and Murillo. (Former § 12022.5, subd. (a)(1).) At the penalty phase, the jury returned a verdict of death. The trial court denied the automatic motion to modify the verdict (§ 190.4, subd. (e)) and sentenced Penunuri to death for the three murders.

SEE CONCURRING AND DISSENTING OPINION

This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment in its entirety.

## I. FACTS

### A. Guilt Phase

Penunuri was tried jointly with codefendants Joseph Castro, Jr., Arthur Bermudez, and Alfredo Tapia. Before the guilt phase began, Penunuri pleaded not guilty to all charges.

#### 1. Prosecution Evidence

##### a. Ralphs Parking Lot Incident

Randy Cordero was driving Shawn Kreisher and David Bellman to the Ralphs market in Whittier on the night of October 23, 1997. The three men parked in the Ralphs parking lot, exited the vehicle, and began to walk toward the store. Several men exited a white Cadillac that was later found to be registered to Alejandro Delaloza. They approached Cordero, Kreisher, and Bellman.

A fight ensued, during which a man, wearing black gloves and holding a knife, punched Bellman. Another man, who was the largest member of the group and was wearing a large dark jacket, demanded money from Kreisher and Cordero. Kreisher gave the man $40 because he thought the man had a gun. Cordero refused, saying he had no money with him. Someone from the Cadillac group yelled, "Get his keys." Cordero returned to his car and pulled a baseball bat out of his trunk. A man then yelled, "Blast 'em" or "Blast his ass," and a man walked toward Cordero, Kreisher, and Bellman, pulled out a gun, and cocked the trigger. Cordero identified the gun as a nine-millimeter handgun. Cordero, Kreisher, and Bellman ran to a nearby intersection where several police officers were gathered and explained what had happened. When Cordero returned to his vehicle, his duffle bag was missing.

2

Kreisher identified Penunuri from a photographic display as the man who took his money and testified that the man who took his money was wearing a large black jacket with a hood.  Cordero also testified that Penunuri was the man who took Kreisher's money and that he was the man who displayed a handgun.  He further testified that Penunuri was wearing a long, bulky sports coat or jacket during the altercation.  He also testified that Delaloza was the man who punched Bellman.  Detective Greg Hamilton showed Cordero a couple of pairs of boxer shorts found at Delaloza's residence.  Cordero identified the items as having been inside his duffle bag before it went missing.

Detective Mary Hanson interviewed Delaloza the day after the incident.  According to Hanson's testimony, Delaloza said he and three friends had gone into the Whittier Ralphs parking lot to use a pay phone.  Delaloza said that he came to the aid of a friend by hitting in the face one of the men his friend was fighting and that he saw one man pull out a baseball bat from his car.  Eventually the three men Delaloza and his confederates had been fighting ran away, and Delaloza claimed some of his friends may have picked up some possessions that had dropped.

Freddie Becerra, a former member of the East Side Whittier Cole Street gang (sometimes referred to as the Cole Street gang), identified as fellow gang members Penunuri, Delaloza, and Jaime Castillo, as well as codefendants Joseph Castro, Jr., Arthur Bermudez, and Alfredo Tapia.

### b.  *Hornell Street Incident*

In the early hours of October 24, 1997, several hours after the Ralphs parking lot incident, Luke Bissonnette and Carlos Arias were sitting and eating in a car parked on Hornell Street near a house belonging to Luke's grandfather.  Luke was a member of the East Side Whittier Cole Street gang.  Luke got out of

3

the car to smoke a cigarette and saw a white Cadillac approach and park on the street in front of his grandfather's house. Luke testified that Penunuri exited the car, walked toward him, called Luke "Youngster" (Luke's gang moniker), identified himself as an "East Sider," and said, "Get in the car." Luke ran from the driveway toward his grandfather's house and hid in the backyard. Shortly after, Luke heard his mother and Penunuri speaking outside but could not understand their conversation.

Roxanne Bissonnette, Luke's mother, testified that she spent the night of October 23 at her father's house on Hornell Street. Early in the morning of October 24, she heard some loud noises and looked outside. Through the window she saw a white Cadillac and "bodies or heads" crossing the front yard. When she opened the door, she saw Delaloza and Penunuri standing outside, with Penunuri wearing a dark jacket. Penunuri asked her if she had seen Arias and said he needed to talk to Arias and Luke. Roxanne Bissonnette warned Penunuri not to touch her son.

Luke testified that Delaloza was driving the white Cadillac and that Penunuri, Castillo, and an unidentified woman were passengers. He identified all four defendants in court and testified that he knew the three men as members of the Cole Street gang.

c.   *Goodhue Street Incident*

After being denied entry to his grandfather's house, Luke returned to the front of the house and saw that everyone had left. He then ran to Laraine Martinez's house on Goodhue Street, where he was living at the time. When he arrived, he joined Arias, his sister Laura Bissonnette, Brian Molina, and Michael Murillo on the patio. Molina and Murillo were asleep when Luke arrived, and he did not speak to them. Arias told Luke that he "almost got killed" because

4

"Richard Penunuri had pulled out a gun and put it to his head." After 20 minutes, Luke, Laura, and Arias went inside. Laraine Martinez, her son Eric Martinez, her daughter Monique Martinez, and Luke's brother Shane Bissonnette were already inside the house.

About 20 minutes later, Luke heard about 10 gunshots and looked outside through a window. Luke testified that he had "seen some figure running outside, and [his] first action [*sic*] was, 'fucking Dozer.' " Dozer was Penunuri's gang moniker. Luke went to the patio and found Murillo unresponsive with three bullet holes in his body. He told his sister to call 911, then returned to the patio where he heard moaning. He found Molina with a gunshot wound above the eye.

Laraine testified that she heard a noise, "like a backfire," as she was falling asleep. She looked through the window and saw "more shooting — or bullets and the flashes of light." She jumped up, ran outside, and called 911. She heard Luke and Shane Bissonnette yell the name Dozer.

Several neighbors on Goodhue Street witnessed the aftermath of the shooting. Matthew Walker, who looked out his window onto Goodhue Street after hearing gunshots, saw a white Cadillac that was not usually parked on the street and that appeared to be empty. Soon thereafter, he saw two men exit the backyard of Laraine's house and enter the Cadillac. The Cadillac then proceeded down Goodhue Street at a slow speed until it was no longer in sight. He did not get a clear look at the men. Two other neighbors testified to hearing gunshots and seeing an older-model white Cadillac driving away shortly thereafter.

Jaime Castillo lived with his uncle, Francisco Castillo, during this time. Francisco testified that he saw Jaime enter their house the morning of October 24 around 7:00 a.m., just as Francisco was leaving for work. Jaime had not spent the previous night at home. When Francisco entered his van to go to work, he found Penunuri asleep in his van and gave him a ride home.

5

### d. *Police Investigation*

On the afternoon of October 24, Officer Jeff Piper executed a search warrant at Delaloza's residence and found a black jacket, a black long-sleeve sweatshirt with a hood, a dark blue long-sleeve sweatshirt with a hood, a small black knife with a belt clip, a pair of black cotton gloves, a plastic box of nine-millimeter ammunition with some bullets missing, keys to the white Cadillac parked in front of the residence, and some men's briefs and socks inside a trash can.

Later that day, Piper arrested Penunuri at his residence and seized a large black jacket from inside Penunuri's bedroom. Ruben Pozo, Penunuri's uncle, was present at the arrest. He spoke with Officer Terence McAllister, who testified that Pozo said Penunuri arrived home between 7:00 and 7:30 that morning. When Pozo testified at trial, he denied making this statement to McAllister and said he told McAllister that Penunuri was in their shared bedroom when he woke up around 5:30 a.m. for work that day.

Richard Catalani, a firearm examiner, testified that all 11 expended casings found at the Goodhue Street location were fired from the same nine-millimeter firearm. Catalani further testified that the expended casings matched the live ammunition found at Delaloza's house. He explained that a live round of ammunition can be marked by the barrel of a gun after insertion into the chamber, by the hook that pulls it out of the chamber, and by the ejector pin that tips the cartridge out of the firearm. After comparing the markings on the live ammunition with the expended casings recovered from the scene, Catalani concluded they "were all worked through the action of the same firearm." He also testified that there were the variety of brands of expended casings found at the Goodhue Street location, similar to a variety of brands of live rounds found at Delaloza's residence.

## e. *Recorded Jail Conversations*

Penunuri's mother, Maria Penunuri, testified about two conversations she had with her son while he was in jail following the October 23 and 24 incidents. These conversations were recorded, and a tape was played to the jury; the jury was also supplied with a transcript of the recording. In the first conversation, recorded on July 19, 1998, Maria said she had "a note [she] wanted to show." Penunuri assured her the conversation was not recorded, but she said she did not want to take a chance. Penunuri said, "I'll tell the investigator too . . . I was messing around with . . . so and so . . . but . . . I kept it a secret because . . . she . . . I'll say she married too [*sic*]." After further discussion, Maria said she "asked [Jessie and Eddie] if they could get someone . . . and they're like well who? . . . And I go well any . . . I go even Aunt Laurie . . . ya know for her . . . you are to say she was with you . . . ." Maria claimed not to remember any of the taped conversation and did not recall whether she passed a note to her son during the visit.

The second conversation was recorded on August 15, 1998. Penunuri said Castillo was with them at Ralphs and was probably with Delaloza later that night "cause look at where he's at . . . he died . . . someone killed him." Penunuri also said he was dropped off between 2:50 a.m. and 3:00 a.m. that night. Maria said that "[Delaloza] better find a way to clean this shit up too." At trial, she testified she did not recall what she meant by that statement.

## f. *Conspiracy to Commit Murder and Murder of Jaime Castillo*

Jesus Marin, testifying under a grant of immunity, described a series of events leading to Jaime Castillo's murder. Marin was associated with members of the East Side Whittier Cole Street gang, although he was not a member himself. He lived with his wife, Tracie McGuirk, their two children, and his wife's friend Carmen Miranda in an apartment in Whittier.

7

Codefendant Castro moved into Marin's garage in December 1997. He stayed there through the beginning of January 1998 and developed a relationship with Miranda. During this time, several members of the gang would hang out and party in Marin's garage. Members of the gang also phoned the apartment; the callers included codefendant Bermudez, codefendant Tapia, and Penunuri. Marin accepted the calls and spoke with Penunuri occasionally. The two would chat briefly, then Penunuri would ask if the "homies" were there. As discussed further below, it was on such phone calls that discussion of the silencing of Castillo occurred.

On January 14, 1999, Marin drove Castro, Bermudez, Tapia, and Castillo into the San Gabriel Mountains, north of the City of Azusa. Marin stopped the car at mile marker 22.27, and everyone exited the car and started doing drugs. While away from the group, Tapia confided in Marin that he would not shoot Castillo. Marin and Bermudez returned to the car. While in the car, Bermudez said that "[Castro's] gonna shoot 'em both." From the rearview mirror, Marin watched Tapia walk toward Castro and Castillo and stand in front of Castillo. Marin then saw Castro walk behind Castillo and shoot him. Castillo dropped to the ground. Castro and Tapia returned to the car, and the four drove back to Marin's apartment.

They arrived at Marin's apartment between 3:00 a.m. and 4:00 a.m. Castro removed a semiautomatic .22- or .25-caliber gun, cleaned it, and placed it on the refrigerator in Marin's apartment. A few hours later, he told Miranda that he shot Castillo. Marin was shaking when he entered his bedroom and proceeded to tell McGuirk that Castillo had been shot.

Several weeks after the shooting, Bermudez visited Marin at his apartment and threatened him because he was a "rat." Fearing for his safety, Marin and his family moved out of the apartment in March 1999.

8

The parties stipulated that Castillo "is the same individual who Mr. Luke Bissonnette claimed he saw the evening of October 23rd, 1997, or the early morning hours of October 24th, 1997."

Department of Transportation workers found Castillo's body in Azusa Canyon the morning of January 15, 1998. A live .22-caliber shell was found within a few feet of Castillo's body. Castillo died of a single gunshot wound to the head.

Telephone records showed that Penunuri called Marin's apartment from county jail seven times between January 5, 1998 and January 15, 1998. The calls ranged from one minute to 31 minutes. The records also showed a series of telephone calls from Penunuri to Marin's apartment between January 15, 1998 and January 25, 1998. We discuss the content of these calls below.

Detective Curt Levsen was raised in Whittier and was familiar with the East Whittier Cole Street gang. Levsen knew Penunuri, Castro, Bermudez, and Tapia to be members of that gang. Ruben Pozo also knew Penunuri to be a member of the Cole Street gang.

### 2. *Defense Evidence*

#### a. *Impeached Testimony of Key Witnesses*

On cross-examination, Cordero admitted that the only distinctive feature of the black jacket he identified as Penunuri's was its color. He also admitted lying under oath about the facts of the case. Cordero further admitted to his prior convictions for forgery and attempted strong-arm robbery and his previous association with members of the Pagans gang in Whittier.

On cross-examination, Luke Bissonnette admitted to drug use the day of the murders. He also admitted he did not know if Penunuri, Delaloza, and Castro were members of the Cole Street gang. The defense also raised questions about

9

whether Luke could accurately observe from a distance, in the dark, from behind, and for only several seconds the person fleeing from the Goodhue Street residence after the murders of Molina and Murillo. An eyewitness identification expert, Kathy Pezdak, testified that when a witness expects to see a particular person but does not get a clear look, the expectation could result in an incorrect identification. In her opinion, Luke's eyewitness identification testimony was "[v]ery unreliable."

During closing argument, defense counsel argued Marin, McGuirk, and Miranda did not provide credible testimony regarding Penunuri's phone calls. Counsel also said that even if Marin was to be believed, Penunuri did not tell Marin to kill Castillo, only to stop Castillo from testifying.

### b. *Evidence of Misidentification of Penunuri as the Perpetrator of the Molina and Murillo Homicides*

The defense presented evidence that Delaloza was likely the perpetrator of the Molina and Murillo homicides. Delaloza was wearing similar clothes to Penunuri on October 23 and 24, and a black jacket and two dark sweatshirts were found at Delaloza's house the next day. The black jacket found at Penunuri's residence did not have any gunshot residue; the black jacket and sweatshirts at Delaloza's home were never tested.

A firearms expert, Lawrence Baggett, testified that firing 11 rounds from a nine-millimeter pistol should deposit gunshot residue on the hands of the person firing the gun. He further testified that he would expect residue to be found on the fabric of a jacket that extended past the gunman's knuckles. Penunuri put on the black jacket found in his room in front of the jury. Penunuri demonstrated that the jacket sleeves extended almost to his fingers when his hands were outstretched. Debra Kowal, a Los Angeles County Department of Medical Examiner-Coroner criminalist, conducted a gunshot residue test on samples taken from the inside and

outside surfaces of Penunuri's jacket sleeves and pockets. She found no particles of gunshot residue.

### 3. Rebuttal Evidence

On May 21, 1999, wiretaps were placed on the telephones at the homes of Marin, Castro, Bermudez, and Tapia, and on the jail telephones of Penunuri and Delaloza. The homes of Castro, Bermudez, and Tapia were searched that same day. Several conversations were recorded from Bermudez's telephone calls. Bermudez said that "we can do [Marin] right away." In another phone conversation, he said he was sleeping with his shoes on so he could run if the police came for him.

## B. Penalty phase

### 1. Prosecution Evidence

#### a. Prior Assault with a Firearm

On May 20, 1997, R.J. Uzel was shot after using a pay phone in a McDonalds. According to the testimony of Debra Recio, who had been with Uzel at the time of the shooting, the word "on the street" was that Dozer was the person who shot Uzel. We describe this incident at greater length below.

#### b. Victim Impact Evidence

The prosecution presented the testimony of various family members concerning the impact on their lives of the murders of Molina, Murillo, and Castillo. The jury heard testimony from Molina's father, mother, brothers, aunt, and godmother, expressing that his death was "heartbreaking" and resulted in a void in their lives. The prosecution played a videotape about Murillo's life and presented testimony from Murillo's grandmother, father, mother, sister, two aunts, cousin, and godmother concerning the impact of his death on the family. The prosecution also presented the testimony of Castillo's father, stepmother, younger

11

brother, two aunts, and cousin, who testified to the grief and anger caused by his death.

### 2. *Defense Evidence*

#### a. *Assessment of Penunuri's Mental Health Issues*

The defense called two doctors to testify about Penunuri's mental state. Dr. Cynthia Stout, a forensic examiner with a doctorate in psychology, conducted a clinical interview with Penunuri and administered a number of psychological tests. She testified that there was a discrepancy between her observations from the interview and the test results. During the interview, she found Penunuri to be social and friendly with normal responses and reactions. The test results, by contrast, showed that Penunuri had elevated results on tests measuring for paranoia, schizophrenia, and mania. The results pointed to a distortion in his personality resulting from use of large amounts of methamphetamine combined with other substances for about two years. Dr. Stout testified that on the night of October 23, 1997, Penunuri had used about two grams of methamphetamine, consumed at least 24 beers, and smoked marijuana.

Dr. James Rosenberg, a psychiatrist, testified on the effects of methamphetamine and the subsequent violent behavior its use may cause. He described the short-term symptoms, which include elevated mood and energy level, feelings of grandiosity and euphoria, decreased appetite, and decreased need for sleep. Dr. Rosenberg testified that methamphetamine use can also cause permanent brain damage and frontal lobe brain syndrome. Brain damage can lead to changes in personality and the development of psychotic symptoms. Damage to the frontal lobe in particular can cause problems with judgment, impulse control, and the ability to control aggressive feelings.

12

*b. Character Witnesses*

The defense provided testimony from Penunuri's close friends and family. George Garcia, Penunuri's cousin and best friend, testified that he saw a change in Penunuri as a result of his use of methamphetamine. He said that prior to Penunuri's drug use, he was the "light of the room," down-to-earth, funny, and caring. He said that Penunuri had been using methamphetamine every day and believed that Penunuri had used methamphetamine on October 23 or 24, 1997, because he had received a large amount before that weekend. As someone who formerly used methamphetamine, Garcia testified that "it makes you do things you wouldn't do in a normal state of mind."

Penunuri's brother Matthew testified that Penunuri helped raise him and was never mean to him. He said that he saw Penunuri get involved in gang life and drugs, but that Penunuri kept him away from that lifestyle. Matthew testified that he did not believe Penunuri would kill someone.

Lupe Villalba, Penunuri's great-aunt, knew Penunuri his entire life. She testified that he was loving, kind, and respectful, and that he had a good relationship with his family.

Rita Garcia, Penunuri's aunt, testified that Penunuri was loving, funny, and respectful, and that he always made them laugh. She said she loved him like a son.

Frances Martinez, Penunuri's grandmother, said Penunuri respected her and was a kind, compassionate boy. She said she wanted to see him live.

Josi Penunuri, Penunuri's grandmother, testified that Penunuri was a wonderful boy. She said she loved him and did not want to lose him.

Maria Penunuri testified that Penunuri was full of life and acted as a big brother to his brother and cousins. He was always laughing and joking around, and showed his family a lot of love. She testified she did not believe Penunuri

13

was capable of committing the crimes of which he has been found guilty. She admitted she created an alibi for the period when the murder occurred because she knew that Delaloza was responsible, and she said she was trying to protect her son from being wrongfully convicted.

## II. PRETRIAL ISSUE

The trial court granted the prosecution's request to remove prospective juror S.M. for cause. Penunuri claims the trial court erred, resulting in a denial of his state and federal constitutional rights to due process, equal protection, an impartial jury, and a fair and reliable penalty determination.

S.M.'s questionnaire revealed that he was married with two children and worked as a Presbyterian minister. Asked to describe his views on the death penalty, he wrote: "They are in flux — away from its use as presently practiced in this country." Asked his "general feelings regarding the death penalty," he wrote: "I find myself having increasing difficulty in its use today. I have read and heard of too many who having received this ultimate penalty were found not to have received all possible consideration." Asked about whether the death penalty serves a purpose, he wrote: "I'm honestly not sure. Vengeance (maybe) but deterrent (?)" Asked "what types of cases justify the death penalty to you," he wrote: "I'm not sure that any do. I know how I feel about serious, brutal crimes against people (esp. those I may love!) but what I feel isn't necessarily justification for what is right." Asked about the "type of things" that he "would want to know about a defendant before deciding between death or life without the possibility of parole," he wrote: "At this point I cannot honestly say. The possibility of being involved with making such a decision feels staggering at the moment." He also indicated on the questionnaire that the death penalty was applied disproportionately to the poor and to those "more marginalized by their race or ethnicity in our society."

S.M. further indicated on the questionnaire that he did not belong to any group advocating the abolition of the death penalty and that his views on the death penalty were based on a religious conviction. As to whether his religious conviction would affect his "ability to render a verdict of death if the facts suggested that this was the appropriate penalty," he did not check either the "Yes" or "No" boxes provided in the questionnaire, but wrote in "<u>Not sure.</u>" He indicated that he did not feel that California should have the death penalty today. Asked if he had such a conscientious opinion concerning the death penalty that he "would automatically in every case, vote for a verdict of life imprisonment without the possibility of parole and under no circumstances vote for a verdict of death," he replied: "I don't think so." Finally, he indicated that death was worse for a defendant than life without parole because "this is the end — no opportunity for change or for justice to make for renewal in defendant or victim's family or friends."

During voir dire, the trial court asked S.M.'s venire panel as a group if there was any of them who could "under no circumstances; no matter what the evidence was; and no matter what the factors in aggravation were, ever vote for a penalty of death." After several prospective jurors raised their hands, S.M. said: "I should probably include myself, your Honor." Later in the voir dire of the same panel, defense counsel asked if any prospective jurors felt they shouldn't serve as a juror because they would be unable to consider either the alternative of the death penalty or the alternative of life without parole if the defendant was convicted of murder with special circumstances. Several prospective jurors sought to disqualify themselves at this point, but S.M. did not.

At the conclusion of this panel's voir dire, the trial court granted the prosecutor's request to excuse S.M. for cause. Neither the prosecution nor the trial

15

court commented on the reasons for the excusal, and defense counsel did not object. S.M. was not individually voir dired.

It is well established that opposition to the death penalty does not by itself disqualify a juror from sitting on a capital case. (*Witherspoon v. Illinois* (1968) 391 U.S. 510, 522.) A juror is validly subject to removal for cause only when "the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Wainwright v. Witt* (1985) 469 U.S. 412, 424.) "[I]n applying this standard, reviewing courts are to accord deference to the trial court. . . . [W]hen there is ambiguity in the prospective juror's statements, 'the trial court, aided as it undoubtedly [is] by its assessment of [the venireman's] demeanor, [is] entitled to resolve it in favor of the State.' " (*Uttecht v. Brown* (2007) 551 U.S. 1, 7.)

Several of S.M.'s responses to key questions were ambiguous. In the questionnaire, he said he was "not sure" whether his religious objections to the death penalty would affect his ability to render a death verdict, but he did not think he would automatically vote for life imprisonment without possibility of parole. And on voir dire, he belatedly raised his hand to include himself within the group of prospective jurors who could not vote for the death penalty under any circumstances, which was consistent with his response on the questionnaire that he was "not sure that any" types of cases justify the death penalty. But later in voir dire, S.M. did not include himself in the group who responded affirmatively to defense counsel's question as to whether any prospective juror would be unable to consider either the death penalty or life without parole if the defendant was convicted of special circumstance murder. In the face of such equivocation, " ' "we defer to the trial court's evaluation of a prospective juror's state of mind, and such evaluation is binding on appellate courts." ' " (*People v. Tully* (2012) 54 Cal.4th 952, 995–996.) S.M.'s responses were sufficiently equivocal for the trial

16

court to determine that his views would substantially impair his service as a juror in this capital case. The trial court did not abuse its discretion in granting the prosecutor's request to remove S.M. for cause.

## III. GUILT PHASE ISSUES

### A. Sufficiency of the Evidence for the Molina and Murillo Murders

The prosecution's principal theory at trial was that Penunuri was the one who shot Molina and Murillo, although the prosecution argued in the alternative that Penunuri could be found guilty on an aider and abettor theory. Penunuri now contends there is insufficient evidence of his liability for these murders. We disagree.

"To assess the evidence's sufficiency, we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict — i.e., evidence that is reasonable, credible, and of solid value — such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial

17

evidence to support" ' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

Penunuri contends there is insufficient evidence to prove that he was the one who committed those murders. We conclude otherwise. At the time of the crimes, Penunuri was uniquely identified as being heavyset, bald, and with no facial hair and wearing a long, bulky black jacket. During the Ralphs parking lot robbery, Randy Cordero identified Penunuri as wielding a nine-millimeter handgun. The testimony of Luke and Roxanne Bissonnette establishes that, just a few hours later, Delaloza drove his white Cadillac to Hornell Street and that Penunuri exited on the passenger side and confronted Luke and Arias. Penunuri approached Luke and demanded that he get in the Cadillac. Based on Arias's excited utterance, Penunuri again wielded a gun, pointing it at Arias's head. Both Luke and Arias fled. At the Hornell Street house, according to Roxanne Bissonnette, Penunuri told her that he was looking for Luke and Arias. Shortly thereafter, the white Cadillac appeared on Goodhue Street and left the scene immediately after the gunshots were fired. A neighbor observed two men entering the Cadillac before it left. Luke, who had known Penunuri for over five years and had seen him just hours before, identified Penunuri as the person seen running across the street from his home after the shooting. Luke believed it was Penunuri because of his body size and because his jacket hood was down. Under the street light, Luke could see "Richard Penunuri's head." Laraine Martinez confirmed that both of her sons, Luke and Shane, observed and immediately identified the man across the street after the gunshots as "Dozer," Penunuri's gang moniker. All casings found at the murder scene were nine-millimeter and were fired from the same gun.

The record thus contains solid evidence from which the jury could infer that Penunuri confronted Luke and Arias, that he searched for them after they fled, and

18

that he, Delaloza, and Castillo pursued Luke and Arias by driving the white Cadillac from Hornell Street to Goodhue Street, where they knew Luke lived. The evidence showed that on Hornell Street, Delaloza was driving the Cadillac he owned and Penunuri was in the passenger seat. The jury could reasonably infer that Penunuri had exited the Cadillac on Goodhue Street and went into Laraine Martinez's backyard. The evidence further showed that Penunuri wielded a gun both during the Ralphs parking lot robbery and during the Hornell Street incident with Arias. No evidence suggests he gave the gun to someone else when he, Delaloza, and Castillo traveled to Goodhue Street. The most probable inference from the evidence is that Penunuri shot Murillo and Molina execution-style while they slept, probably believing they were Luke and Arias.

Moreover, the jury reasonably could have credited Ruben Pozo's original statement to the police that Penunuri arrived home between 7:00 and 7:30 a.m. rather than Pozo's testimony at trial denying having made such a statement and telling the police that that Penunuri was in their shared bedroom when he woke up around 5:30 a.m. for work that day.

Penunuri's guilt is further confirmed by his instruction to his gang confederates to prevent Castillo from testifying, eventually leading to Castillo's murder, as discussed further below. Penunuri's instigation of the conspiracy to kill Castillo, with its clear motive of silencing him as a witness, was evidence of Penunuri's consciousness of guilt.

We conclude there is sufficient evidence that Penunuri murdered Murillo and Molina and that the murders were in the first degree. Accordingly, we also reject Penunuri's claim that the jury's multiple-murder special-circumstance finding is not supported by sufficient evidence.

19

**B. The Evidence Is Sufficient to Support the Conviction for the Conspiracy to Murder Jaime Castillo**

Penunuri contends that the evidence is insufficient to support the jury's guilty verdict on his participation in the conspiracy to commit the murder of Jaime Castillo.

From December 1997 through January 1998, Penunuri made phone calls to Marin's apartment from jail. During one of the calls, Marin overheard a conversation in which Penunuri spoke to fellow gang members Castro and Bermudez. According to Marin, Castro mentioned Castillo by his gang moniker "Cartoon" and said, "I'll handle it." After the call, Castro explained that Penunuri had said that "Cartoon was gonna rat him out" and that they needed to tell "Cartoon to shut up, keep his mouth shut." A few days later, Penunuri called again and spoke to Marin. Penunuri said that Castillo was "gonna rat him out" and that Marin should tell Castillo "not to say shit, that that's wrong." Marin testified about further conversations Penunuri had with Tapia, Bermudez, and Castro. After one such conversation, Castro, Bermudez, and Tapia discussed plans to harm Castillo, specifically for Tapia to "blast" Castillo.

Tracie McGuirk also received calls from Penunuri and overheard a conversation between Penunuri and Castro. During the call, Castro said to Bermudez, who was standing nearby, that Castillo was going to testify against Penunuri. Castro told Penunuri, "[d]on't worry about it" because he would take care of it.

Carmen Miranda, who was living in the apartment at the time, also overheard a conversation Penunuri had with Castro and Bermudez. Castro or Bermudez mentioned "Cartoon," Castillo's gang moniker, and Castro said, "Oh. You want us to — you want us to get rid of him —." Castro replied, "Yeah. Me and [Bermudez] will get rid of 'em." Later in her testimony, Miranda said she

heard Castro say, "Oh. He's gonna testify against you in your case? Oh. Don't worry. We're gonna get rid of him. Me and [Bermudez's] gonna get rid of him."

Penunuri argues that there is insufficient evidence to prove that he had intent to kill Jaime Castillo. He argues that the conversations above provide evidence only of conspiracy to commit witness intimidation.

"Conspiracy to commit murder requires an agreement to commit murder and an overt act by one or more of the conspirators." (*People v. Juarez* (2016) 62 Cal.4th 1164, 1169.) Conspiracy also requires specific intent, which includes two elements: (1) the intent to agree or conspire and (2) the intent to commit the offense that is the object of the conspiracy. (*People v. Swain* (1996) 12 Cal.4th 593, 600.) Evidence of an agreement does not require proof that the parties met and expressly agreed; a criminal conspiracy can be shown through circumstantial evidence. (*People v. Vu* (2006) 143 Cal.App.4th 1009, 1025.) "Evidence is sufficient to prove a conspiracy to commit a crime 'if it supports an inference that the parties positively or tacitly came to a mutual understanding to commit a crime. [Citation.] The existence of a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy.' " (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1135 (*Rodrigues*).)

In this case, there were at least two statements, overheard by witnesses to conversations between Penunuri and gang members involved in the Castillo killing, from which a jury could infer that Penunuri was involved in the conspiracy to murder Castillo. First, Carmen Miranda testified that Castro said in reply to Penunuri, "You want us to get rid of him." Penunuri points to the fact that she said later in her testimony that Castro said, "Oh. He's gonna testify against you in your case? Oh. Don't worry. We're gonna get rid of him. Me and [Bermudez's] gonna get rid of him." But the jury could have found her first version of the

21

statement, which she never repudiated, more credible. And even crediting the later statement, the jury could have inferred from Castro's reply — "Don't worry. We're going to get rid of him" — that Penunuri and Castro had arrived at " 'a mutual understanding' " to commit the murder. (*Rodrigues*, *supra*, 8 Cal.4th at p. 1135.)

Second, Marin testified that sometime after speaking to Penunuri on the phone, Castro, Bermudez, and Tapia discussed plans to "blast Castillo." In light of the strong evidence that Penunuri conspired with his confederates to stop Castillo from testifying, the statements above constitute sufficient evidence from which a jury could reasonably infer that Penunuri's intent crossed the line from intimidation into murder.

Penunuri also contends that evidence of the conspiracy to commit murder is insufficient in light of the law regarding the admission of hearsay statements by coconspirators incorporated in CALJIC No. 6.24, which states: "Evidence of a statement made by one alleged conspirator other than at this trial shall not be considered by you as against another alleged conspirator unless you determine by a preponderance of the evidence: [¶] 1. That from other independent evidence that at the time the statement was made a conspiracy to commit a crime existed; [¶] 2. That the statement was made while the person making the statement was participating in the conspiracy and that the person against whom it was offered was participating in the conspiracy before and during that time; and [¶] 3. That the statement was made in furtherance of the objective of the conspiracy." (See *People v. Prieto* (2003) 30 Cal.4th 226, 251, fn. 10.) Here, Marin's testimony about his conversation with Penunuri established that Penunuri was conspiring with him and his fellow gang members to criminally coerce Castillo into not testifying. Hearsay statements such as the one made by Castro and reported by Miranda were therefore admissible to define the exact nature of the conspiracy.

22

Penunuri contends that his claim of insufficient evidence is demonstrated by the jury's failure to return a true finding on one of the overt acts alleged in connection with the charge of conspiracy to commit murder. Specifically, Penunuri notes that of the nine acts listed, only one involves him directly, and it is not marked true. This act states "that on and between January 1, 1998 and January 14, 1998, Richard Penunuri, Joe Castro, Arthur Bermudez, and Alfredo Tapia, discussed a plan to murder Jaime Castillo. . . ." The other eight overt acts, including the five overt acts that the jury found true, include only alleged coconspirators Castro, Bermudez, and Tapia.

Although a conviction of conspiracy does require commission of an overt act in furtherance of the agreement, the act does not need to be committed by every conspirator. "Once one of the conspirators has performed an overt act in furtherance of the agreement, 'the association becomes an active force, it is the agreement, not the overt act, which is punishable.' " (*People v. Johnson* (2013) 57 Cal.4th 250, 259.) The jury found true five overt acts committed by Penunuri's alleged coconspirators, Castro, Bermudez, and Tapia. Although Penunuri did not personally perform any of the five acts, the element of an overt act in furtherance of the conspiracy was satisfied.

In sum, we conclude that substantial evidence supported Penunuri's conviction on the charge of conspiracy to murder Castillo.

### C. Sufficiency of the Evidence to Support the Conviction for Aiding and Abetting Castillo's Murder

Penunuri contends there was insufficient evidence to support his conviction for the murder of Castillo on an aiding and abetting theory. " '[A]n aider and abettor is a person who, "acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes,

23

encourages or instigates, the commission of the crime." ' " (*People v. Jurado* (2006) 38 Cal.4th 72, 136.)  As discussed above, there was sufficient evidence that Penunuri intentionally promoted, encouraged, and instigated the murder of Castillo through his conversations with his gang confederates while in jail awaiting trial for the murder of Molina and Murillo.  His conviction for that murder on an aiding and abetting theory is therefore supported by substantial evidence.

### D. Sufficiency of the Evidence to Support the Witness Killing Special Circumstance

The jury found true the witness killing special circumstance.  (§ 190.2, subd. (a)(10).)  Penunuri claims this finding was not supported by substantial evidence.  As discussed above, substantial evidence supported his conviction for the first degree murder of Castillo on an aiding and abetting theory.  The evidence discussed above in connection with the Castillo murder also establishes that the primary motive for the murder was to silence Castillo as a witness to the murder of Molina and Murillo.  We therefore reject his challenge to the witness killing special circumstance.

### E. Sufficiency of the Evidence for the Assault on Carlos Arias

As noted, the evidence showed that Penunuri pointed a gun at Arias at the Hornell Street location earlier in the morning before the Goodhue Street murders. According to the statement made by Arias to Luke Bissonnette, to which Luke testified at trial, Penunuri pulled out a gun and pointed it at Arias.  Penunuri now contends there was insufficient evidence that the gun was loaded and thus insufficient evidence he committed the assault.

"A long line of California decisions holds that an assault is not committed by a person's merely pointing an (unloaded) gun in a threatening matter at another person." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11, fn. 3.)  However, the fact

24

that the gun was loaded may be inferred from circumstantial evidence, and we will uphold an assault conviction if the inference is reasonable. (See *id.* at p. 12.) Here, the jury could reasonably infer, as the prosecutor argued, that the gun Penunuri pointed at Arias was the same gun that was used to kill Murillo and Molina a few hours later, and was therefore loaded at the time of the assault. We reject Penunuri's claim that the evidence is insufficient to support his assault conviction.

### F. Denial of Motion for a Mistrial After Mention of Association with Mexican Mafia

The prosecution sought the testimony of Detective Curt Levsen, an expert on the East Side Whittier Cole Street gang to which Penunuri belonged. The prosecution wanted Levsen to explain certain gang signs used by the Cole Street gang and to demonstrate that they were a "very cohesive group," which would further illuminate why Penunuri chose the three people that he did to "take care of Jaime Castillo." The trial court was initially reluctant to admit the testimony because the gang affiliation of Penunuri and his coconspirators had already been established, but it ultimately agreed to permit Levsen to testify regarding the gang signs. In particular, the court allowed Levsen to interpret a photograph depicting the "signs that we see . . . defendants in this court throwing . . . ."

On direct examination, Levsen commented on a photograph showing several individuals identified as members of the Cole Street gang making various signs, including the shape of the letters E, W, and C to signify East Side Whittier Cole Street gang. The photograph also showed three individuals, one holding his forearms crossed to simulate an X, one holding his forearms parallel to simulate the roman numeral II, and a third holding his right arm parallel to the other arms, so as to spell out roman numeral XIII. When asked to explain the significance of the sign, Levsen said: "13 is the number that is used by Southern California

25

Hispanic Street gangs to show their allegiance to the Mexican Mafia, because 13 . . . represents the 13th letter of the alphabet, which is M, which is their way of showing their allegiance to the Mexican Mafia. [I'm] not saying these individuals are members of that Mexican Mafia, but just they're under the jurisdictional rule of the Mexican Mafia. In other words, they are Sureños in Southern California, and they pay taxes to the Mexican Mafia."

At this point, Penunuri's trial counsel objected, moved to strike the testimony for lack of foundation, and moved for a mistrial. The trial court overruled the objection but struck Levsen's testimony about paying taxes to the Mexican Mafia and instructed the jury to disregard it. Defense counsel later filed a written motion for a mistrial on the ground that Levsen's statements regarding Penunuri's affiliation with the Mexican Mafia were highly prejudicial in a manner that could not be cured by admonition. The trial court denied the written motion and made clear it did not view Levsen's testimony as damaging. The trial court also made clear that it would not have allowed the testimony regarding the Mexican Mafia had it known Levsen would bring it up. But the court concluded that the number XIII sign was a show of "bravado" and that "I don't think any reasonable person would conclude that these young people are saving their pennies to pay dues to some shadow organization." Although denying the written mistrial motion, he agreed to instruct the jury to disregard all reference to the Mexican Mafia.

On appeal, Penunuri renews his claim that the trial court erred in denying the mistrial motion, arguing that Levsen's reference to the Mexican Mafia was so prejudicial that it could not be cured by admonition. "In reviewing rulings on motions for mistrial, we apply the deferential abuse of discretion standard. [Citation.] 'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular

26

incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. [Citation.]' " (*People v. Wallace* (2008) 44 Cal.4th 1032, 1068.)

Here, Levsen's mention of the Mexican Mafia was brief, and he made clear he was "not saying that these individuals are members of that Mexican Mafia" but that they are "under the jurisdictional rule" and "pay taxes" to the Mexican Mafia. Penunuri contends that, in light of the Mexican Mafia's reputation as a dangerous prison gang known for ordering the murder of witnesses (see *Alvarado v. Superior Court* (2000) 23 Cal.4th 1121, 1128–1129), any association would have been incurably prejudicial. We conclude that the trial court did not abuse its discretion by determining that Levsen's brief reference to the Mexican Mafia, which included his qualification that he was not saying Penunuri or his codefendants were members of the organization, made such an impact on the jury that it could not be corrected by admonition.

Penunuri also argues that the prosecution's questioning of Levsen constituted prosecutorial misconduct for which a mistrial was the appropriate remedy. In deciding whether prosecutorial misconduct justifies a mistrial, we employ the same inquiry as determining whether such misconduct warrants reversal of a verdict. (See *People v. Ayala* (2000) 23 Cal.4th 225, 283–284.) " ' " ' "A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.' " ' [Citation.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ' " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' " ' " (*Ibid.*)

Penunuri contends that the prosecutor acted deliberately and deceptively in eliciting testimony that he knew would be highly prejudicial. But a prosecutor is generally not guilty of misconduct "when he questions a witness in accordance with the court's ruling." (*People v. Rich* (1988) 45 Cal.3d 1036, 1088.) Nor does asking a question to which an objection is sustained constitute misconduct. (*People v. Hinton* (2006) 37 Cal.4th 839, 864.) As noted, the trial court agreed to permit Levsen to interpret a photograph depicting the "signs that we see . . . defendants in this court throwing." The prosecutor's questioning of Levsen fell within the trial court's authorization; the defense objected to Levsen's mention of the Mexican Mafia; and the trial court agreed to instruct the jury to disregard all references to the Mexican Mafia. On this record, we are unable to conclude that the prosecutor engaged in misconduct or that the trial court abused its discretion in denying the mistrial motion.

### G. Violation of Confrontation Clause Through Admission of Arias's Out-of-court Statements

The prosecution was unable to locate Arias, and the trial court deemed him an unavailable witness. The court admitted three types of out-of-court statements made by Arias: (1) statements he made to Luke Bissonnette, who testified to them at trial; (2) the prior testimony of Arias in Delaloza's trial; and (3) Arias's taped statement to the police. Penunuri contends that the admission of each of these statements was erroneous and violated his right to cross-examine witnesses under the confrontation clause of the Sixth Amendment to the United States Constitution. The Attorney General argues that Arias's statement to Luke Bissonnette was properly admitted as an excited utterance but concedes that the admission of Arias's prior testimony and his statement to the police violated the confrontation clause. The Attorney General contends, however, that this claim is forfeited on appeal and that the error, in any event, was not prejudicial. We

28

conclude that Arias's statement to Luke Bissonnette was properly admitted and that the other statements were indeed admitted in error and the claim of error is not forfeited on appeal. We address the question of prejudice further below.

### 1. Facts

Luke Bissonnette had been with Arias in a car on Hornell Street earlier in the evening of October 23, 1997 before the murders of Molino and Murillo at the Goodhue Street house. As noted, Luke had run from Penunuri into the yard of his grandfather's house after Penunuri had confronted him and ordered him into the white Cadillac. Later, Luke heard a commotion and saw Arias run and jump the fence of his grandfather's backyard. After running from the Hornell Street house to the Goodhue Street house, Luke saw Arias talking to Luke's sister, Laura. According to Arias's statement to police, he had hidden for about 20 minutes after jumping the fence before heading to the Goodhue Street house. Arias, Laura, and Luke stayed on the patio of the Goodhue Street house for about 20 minutes before they went inside. Luke testified that before entering the house, Arias was "exhausted from running, really tired, still breathing heavy." Over counsel's hearsay objection, Luke testified that Arias's "eyes were big, like he almost got killed, he said, that night." Over further hearsay objection, Luke testified that Arias told him that as he was exiting the car on Hornell Street, Penunuri pulled out a gun and put it to his head. The trial court agreed with the prosecution that Arias's statement to Luke was an excited or spontaneous utterance and was therefore admissible.

In Arias's tape-recorded interview with the police, which was admitted over defense hearsay objection, Arias said he had run from the vehicle he was sitting in at Hornell Street after he had seen "that guy . . . I guess Dozer or whatever" charging Luke, causing Luke to run to the back of the house and Arias to also run.

29

According to Arias's statement, Penunuri pointed a gun at him, and Penunuri was "chubby" and wore a black jacket with a hood. Arias also told the police that the person running away from the Goodhue Street house wore the same jacket.

Finally, Arias's testimony from Delaloza's trial was admitted into evidence over a hearsay objection. The testimony made clear that Arias had not wished to testify and was taken into custody after refusing to respond to a subpoena. He recanted much of what he told the police, including his statement that Penunuri had pointed a gun at him on Hornell Street on the night of the murders and he denied he was able to identify anyone running from the Goodhue Street house.

### 2. Forfeiture

The Attorney General contends that Penunuri forfeited his confrontation clause claim with respect to the admission of Arias's taped statement to the police because although counsel objected to the statements as hearsay, he did not object specifically on confrontation clause grounds. Since the Attorney General's brief was filed, we have clarified that because *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*) made a sweeping change in the interpretation of the confrontation clause, a defendant tried before *Crawford* "does not forfeit a *Crawford* challenge by failing to raise a confrontation clause objection at trial." (*People v. Rangel* (2016) 62 Cal.4th 1192, 1215.) Penunuri was tried in 2000, prior to *Crawford*, and so did not forfeit his confrontation clause claim.

### 3. Excited Utterance Exception and Arias's Statement to Luke Bissonnette

Penunuri claims the trial court erred in admitting what Arias said to Luke at the Goodhue Street house under the excited or spontaneous utterance exception to the hearsay rule. As an initial matter, we note that the confrontation clause is not at issue here because Arias's statement to Luke was not testimonial. (See *Davis v.*

*Washington* (2006) 547 U.S. 813, 822 (*Davis*).)  The only question is whether Arias's statement falls within any state law exception to the hearsay rule.

"Evidence of a statement is not made inadmissible by the hearsay rule if the statement:  [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception."  (Evid. Code, § 1240.)  For a statement to fall within this exception, " 'it is required that (1) there must be some occurrence startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it.' [Citations.]" (*People v. Poggi* (1988) 45 Cal.3d 306, 318.)  " 'When the statements in question were made and whether they were delivered directly or in response to a question are important factors to be considered on the issue of spontaneity.  [Citations.]  But . . . ["n]either lapse of time between the event and the declarations nor the fact that the declarations were elicited by questioning deprives the statements of spontaneity *if it nevertheless appears that they were made under the stress of excitement and while the reflective powers were still in abeyance.*" ' " (*People v. Brown* (2003) 31 Cal.4th 518, 541 (*Brown*), italics in original.)

In *Brown*, we concluded that the trial court did not abuse its discretion in finding a statement made two and a half hours after a shooting to be a spontaneous utterance, where the declarant was still visibly shaking and crying after having watched the shooting.  (*Brown*, *supra*, 31 Cal.4th at p. 541; see also *People v. Raley* (1992) 2 Cal.4th 870, 893–894 [statement admitted as spontaneous utterance 18 hours after event].)

31

Here, Arias, by his own estimation, hid for about 20 minutes after being confronted by Penunuri and then proceeded to the Goodhue Street house. He was in the backyard with Luke and Laura Bissonnette for about 20 minutes when he told Luke about the incident with Penunuri. Therefore, the time between his encounter with Penunuri and his statement to Luke about that encounter was between 20 and 40 minutes. When he appeared at Goodhue Street, he was out of breath from having run from Hornell Street, and Luke testified that Arias's "eyes were big and told Luke that he "almost got killed . . . that night." Under these circumstances, the trial court did not abuse its discretion in concluding that Arias, at the time he made his statement, was still in an excited and unreflective state of stress from having had a gun pointed at him less than an hour before.

### 4. Admission of Arias's Taped Statement and Prior Testimony in Delaloza's Trial

As the Attorney General concedes, the admission of Arias's taped statement to the police and his testimony in the Delaloza trial were inadmissible. Both were testimonial statements (see *Davis*, *supra*, 547 U.S. at p. 822), and Penunuri and his counsel were unable to cross-examine Arias. The prejudicial effect of these errors is considered further below in a discussion of cumulative error.

### H. Violation of the Confrontation Clause Through Admission of Delaloza's Out-of-court Statements

Penunuri contends that admission of Delaloza's taped testimony violated his confrontation rights as well as the state hearsay rule.

### 1. Background

Delaloza refused to testify at Penunuri's trial and was deemed an unavailable witness. The prosecution sought to admit Delaloza's taped interrogation by Whittier police on the night of October 24, 1997. In that

32

interrogation, Delaloza said he and Penunuri were members of the East Side Whittier Cole Street gang. As noted, Delaloza said with respect to the Ralphs parking lot robbery on October 23, 1997, that he saw one man pull out a baseball bat from his car and that he (Delaloza) came to the aid of a friend by hitting in the face one of the men his friend was fighting. After the three men Delaloza and his confederates had been fighting ran away, Delaloza claimed some of his friends may have picked up some possessions that had dropped. Later on the night of October 23, 1997, he and Penunuri went to Luke's grandfather's house "just ta see what [Luke's] up to" because they had not spoken in a long time. While there, Penunuri spoke with Luke's mother, and Delaloza stayed in the car. Delaloza saw someone else whom he recognized but did not know and asked him to "party," but the person refused. Delaloza noted that Luke sometimes went to Laraine Martinez's house on Goodhue Street.

According to Delaloza, he and Penunuri went to the house on Goodhue Street later that night to talk to Monique Martinez, his friend's ex-girlfriend. They parked around the corner, and Delaloza waited in the car while Penunuri went to the house to bring Monique out. Delaloza then heard gunshots and saw Penunuri running back to the car. At the time, he thought someone was shooting at Penunuri. He said he never saw Penunuri with a gun that night. He drove Penunuri home at around 3:45 a.m. When questioned about Penunuri's clothing, Delaloza said Penunuri was wearing a parka and jeans.

Defense counsel objected to admission of the tape, arguing that "[t]he statements that are given by [Delaloza] to the police are exculpatory. They're not against penal interest. They're in his own interests trying to disavow himself from this event . . . ." The trial court judge rejected defense counsel's argument and admitted the tape, concluding that "[w]hether or not the statement is exculpatory or incriminating I think is a question of fact to be determined by the jury." Later,

33

the court admitted testimony by a Whittier police detective recounting statements that Delaloza had made in the course of interrogation. Defense counsel objected to the admission of the detective's testimony on hearsay grounds and on *Aranda*/*Bruton* grounds. (See *People v. Aranda* (1965) 63 Cal.2d 518; *Bruton v. United States* (1968) 391 U.S. 123 [nontestifying codefendant's extrajudicial statement that incriminates the other defendant is inadmissible at a joint trial].)

### 2. Analysis

"Unconfronted accomplice statements to authorities [are] 'core testimonial statements that the Confrontation Clause plainly meant to exclude.' " (*People v. Hopson* (2017) 3 Cal.5th 424, 432, quoting *Crawford*, *supra*, 541 U.S. at p. 63.) The Attorney General concedes that the admission of Delaloza's prior statements made under police interrogation were testimonial and that their admission violated the confrontation clause. Having reached this conclusion, we need not determine whether the trial court properly applied the two-step analysis — determining first whether a statement is hearsay and then whether it is testimonial — set forth in *People v. Sanchez* (2016) 63 Cal.4th 665, 680. As with the confrontation clause errors concerning Arias's statements, the prejudicial effect of the erroneous admission of Delaloza's prior statements is addressed further below in a discussion of cumulative error.

## I. Instructional Error Regarding Delaloza's Accomplice Testimony

As noted, Delaloza refused to testify at trial, and the prosecution presented out-of-court statements by Delaloza in support of the robbery of Kreisher and Cordero and the murders of Molina and Murillo. Penunuri claims that the trial court should have instructed the jury sua sponte that Delaloza was an accomplice as a matter of law. Penal Code section 1111 states that a conviction cannot be "had upon the testimony of an accomplice unless it be corroborated by such other

34

evidence as shall tend to connect the defendant with the commission of the offense." The trial court, using CALJIC No. 3.16, instructed the jury that the testimony of an accomplice requires corroboration only with respect to Jesus Marin, who participated in Castillo's murder. Penunuri claims it was error not to give the same instruction with respect to Delaloza.

Assuming it was error to fail to furnish the CALJIC No. 3.16 instruction specifically to Delaloza, we conclude the error was harmless. Immediately before the jury heard Delaloza's out-of-court statements, the trial court informed the jury that Delaloza had been tried for the murders of Molina and Murillo, had been sentenced, and that his case was on appeal. The court said: "We don't know what the jury decided in that case as to the reason, whether they convicted him as a principal, as an accomplice, as an aider and abettor. But at least, for our purposes, he would be an accomplice. When an accomplice testifies, whether by live testimony or by testimony in writing, that testimony must be corroborated. It doesn't require evidence that's beyond a reasonable doubt to corroborate. The corroboration can be evidence that is only slight." The trial court then informed the jury that Delaloza's testimony should be regarded as "untrustworthy – because of the fact that he has his own axe to grind by testifying in the matter." That admonition, in combination with the fact that the jury knew Delaloza had been charged with the same crime, would have inclined the jury to view his testimony with distrust. (See *People v. Williams* (2010) 49 Cal.4th 405, 456 [failure to give accomplice instruction harmless when "the jury would have been inclined to view [the] testimony with caution even in the absence of an instruction" because the witness had been arrested in connection with the crime].)

Further, even if the jury would not have understood the corroboration requirement with respect to Delaloza's testimony, the error is harmless because there was sufficient corroboration of Penunuri's involvement in the Murillo and

35

Molina murders, including Luke Bissonnette's identification of Penunuri on Goodhue Street a few moments after the shots were fired. (See *People v. Whisenhunt* (2008) 44 Cal.4th 174, 215 [failure to instruct on accomplice testimony is harmless where there is sufficient corroborating evidence in the record].)

Penunuri also contends that even if the jury was properly apprised of Delaloza's accomplice status with respect to the Murillo and Molina murders, it was not so informed with respect to the robbery of Cordero and Kreishner. But it is unlikely the jury would have viewed with distrust Delaloza's testimony with respect to the former crimes but not the latter. Penunuri's involvement in the robbery was also amply corroborated by the robbery victims themselves.

## J. Trial Court's Allegedly Improper Comments Before Introduction of Delaloza's Statements

Penunuri contends that several of the trial court's comments before the introduction of Delaloza's statements, made in the presence of the jury, were improper and prejudiced him.

The prosecution sought Delaloza's testimony at trial. Delaloza had already been convicted and sentenced for the Ralphs parking lot robbery and the first degree murder of Molina and Murillo, but his appeal was pending. When brought to court in Penunuri's trial, he invoked his right to remain silent. The court called in the jury and informed them that Delaloza had refused to testify. The court then discussed with counsel, in the jury's presence, whether Delaloza's out-of-court statements should be admitted. Penunuri's counsel argued that the statements should not be admitted because they were not against penal interest (i.e., Delaloza disavowed personal responsibility and shifted the blame to Penunuri) and that the defense would make an offer of proof that Delaloza was the shooter. In response, the prosecution argued that it was established that Delaloza was the driver of the

36

white Cadillac seen on Goodhue Street at the time of the murder and that the keys to the Cadillac were found among his property when his residence was searched, which meant "he had control over the Cadillac that night." The trial court commented: "I think that's inherent in his statement that he made." The prosecutor further said that given the circumstantial evidence establishing him as the "wheel man," "the getaway driver from the double murder scene," Delaloza's statements were an admission of criminal liability. When Penunuri's counsel continued to protest that Delaloza's statements were exculpatory, the court commented: "That doesn't make sense. He was there. He was the driver of the car. He admits that."

Before playing the audiotape of Delaloza's testimony for the jury, the trial court reiterated its disagreement with defense counsel's position that Delaloza's statements were exculpatory. Then, during a sidebar, the defense asked the trial court to inform the jury that Delaloza "has been convicted in this case, so that they can properly judge his testimony." The court agreed and informed the jury that Delaloza had been convicted of the Goodhue Street murders and that his appeal was pending.

Penunuri makes several claims of error. As an initial matter, he contends that the hearing regarding the admission of Delaloza's statements should have been held outside the presence of the jury. Evidence Code section 402, subdivision (b), provides: "The court may hear and determine the question of the admissibility of evidence out of the presence or hearing of the jury; but in a criminal action, the court shall hear and determine the question of the admissibility of a confession or admission of the defendant out of the presence and hearing of the jury if any party so requests." Thus, "subdivision (b) requires a hearing out of the jury's presence only (1) in a criminal action, (2) regarding admissibility of a confession or admission (3) of the defendant, and only (4) if any party so requests;

37

otherwise the court may hear and determine the question in the jury's presence."
(*People v. Rodriguez* (1971) 18 Cal.App.3d 793, 798.) " 'Ordinarily, the better
practice requires that all doubtful questions of evidence or procedure should not be
proposed or discussed in the presence of the jury.' " (*Ibid.*) But a defendant who
does not object to holding a hearing on the admissibility in the jury's presence
forfeits the claim on appeal. (*Ibid.*) No objection was made here.

Next, Penunuri claims that during the discussion of the admissibility of
Delaloza's statement in front of the jury, the trial court improperly vouched for the
prosecutor. "A trial court may comment on the evidence (Cal. Const., art. VI,
§ 10), but such comments 'must be accurate, temperate, nonargumentative, and
scrupulously fair. [Citation.]' " (*People v. Sturm* (2006) 37 Cal.4th 1218, 1232.)
In response to the prosecution's statements that circumstantial evidence showed
that Delaloza was the driver of the white Cadillac present at the Goodhue Street at
the time the murders, the trial court responded: "I think that's inherent in his
statement that he made." The trial court later made a similar statement in response
to Penunuri's objection to the admission of Delaloza's testimony. The trial court's
statements simply conveyed that Delaloza admitted to being the driver of the white
Cadillac on Goodhue Street and that this admission was against Delaloza's penal
interest. We find no improper vouching by the court here.

Penunuri also claims that the trial court erred in disclosing to the jury that
Delaloza had been convicted of the Ralphs parking lot robbery and Goodhue
Street murders. He cites *People v. Young* (1978) 85 Cal.App.3d 594, 601–602, for
the proposition that revealing an accomplice's conviction or guilty plea can at least
under some circumstances be error, "tantamount to inadmissible hearsay
evidence." (*Id.* at p. 602.) Assuming it was error, the error was invited. As noted,
it was defense counsel who requested that the jury be told about Delaloza's
convictions "so that they can properly judge his testimony." Thus, counsel made a

strategic judgment that the revelation of Delaloza's convictions would more likely benefit than harm his client by impeaching Delaloza's credibility. Because any error was invited by the defense, it cannot now be asserted as a basis for relief. (See *People v. Cooper* (1991) 53 Cal.3d 771, 830–831.)

### K. CALJIC No. 17.41.1

The trial court instructed the jury with CALJIC No. 17.41.1 as follows: "The integrity of a trial requires that jurors, at all times during their deliberations, conduct themselves as required by these instructions. Accordingly, should it occur that any juror refuses to deliberate or expresses an intention to disregard the law or to decide the case based on penalty or punishment in this phase of the case, or any other improper basis, it is the obligation of the other jurors to immediately advise the Court of the situation."

Penunuri contends that this instruction deprived him of his right to a jury trial and to due process "because the instruction invades the secrecy of jury deliberations and chills free and open debate, especially by jurors who hold a minority view." He acknowledges that we held in *People v. Engleman* (2002) 28 Cal.4th 436, 443–445, that instructing the jury in CALJIC No. 17.41.1 did not violate the defendant's state or federal constitutional rights. But we went on in *Engleman* to exercise our supervisory power to direct courts not to give that instruction because it "creates a risk to the proper functioning of jury deliberations" that is not necessary or advisable. (*Engleman*, at p. 449.) Nonetheless, we have made clear that the furnishing of this instruction is not a basis for reversing a conviction. (*Ibid.*; see *People v. Rogers* (2013) 57 Cal.4th 296, 340.)

## L. Cumulative Error

As explained above, the trial court committed three confrontation clause errors: admitting Arias's taped statement to the police, admitting Arias's prior testimony at Delaloza's trial, and admitting Delaloza's statements to the police. A violation of the confrontation clause is harmless if the court can conclude beyond a reasonable doubt that it did not affect the verdict. (*People v. Jennings* (2010) 50 Cal.4th 616, 654.) The ultimate inquiry is " ' "whether the . . . verdict actually rendered in this trial was surely unattributable to the error." ' " (*People v. Pearson* (2013) 56 Cal.4th 393, 463.) We conclude these errors were harmless beyond a reasonable doubt because they added little if anything to the properly admitted evidence against Penunuri.

Arias's taped statement to the police identified Penunuri as the person who pointed a gun at his face on Hornell Street and also indicated that the person he saw running from the Goodhue Street house was wearing the same jacket he had seen Penunuri wear in that confrontation. Evidence of that confrontation was already properly admitted in the form of Luke Bissonnette's testimony about Arias's spontaneous utterance when he arrived at Goodhue Street. Arias's statement about Penunuri on Goodhue Street was cumulative of the stronger testimony by Luke Bissonnette positively identifying Penunuri across from the Goodhue Street house after the shooting. Nor did Arias's testimony at Delaloza's trial, recanting his prior statements incriminating Penunuri, prejudice Penunuri. And because Arias's statements regarding Penunuri's assault against him on Hornell Street were supported by the properly admitted and unchallenged testimony of Luke Bissonnette, we further reject Penunuri's claim that his conviction for that assault should be reversed.

As for Delaloza's statement, the jury was likely to discount it for several reasons. First, they were aware that he had been tried and convicted for the

Goodhue Street murders and that any statement he had made to investigating authorities was likely to be exculpatory, a view reinforced by the trial court advisement to the jury that Delaloza's statement was to be viewed as "untrustworthy." Second, the content of his statement gave the jury further cause to disbelieve him. His claim that he and Penunuri went to Goodhue Street for the innocent purpose of talking to an ex-girlfriend of one of their fellow gang members was contrary to the considerable evidence that they went to Goodhue Street in pursuit of Arias and Luke Bissonnette after a hostile encounter with them at Hornell Street. And his claim that Penunuri was the only person to go toward and then run from the Goodhue Street house was contradicted by the disinterested testimony of a neighbor, Matthew Walker, who saw two men running from the house after the shots were fired.

According to Penunuri, the damage to his case comes from Delaloza placing Penunuri rather than himself in the backyard of the Goodhue Street house at the time the shots were fired, thereby undermining Penunuri's defense theory that Delaloza was the real shooter. But Delaloza also said he did not see Penunuri in possession of a gun when he ran into the backyard of the Goodhue Street house. There is no reason to suppose the jury would selectively believe Delaloza about being the one who stayed behind in the car but not believe his statement that Penunuri was unarmed when he entered the backyard at Goodhue Street. To the extent that the jury selectively credited Delaloza's testimony — i.e., believed that Penunuri did approach the Goodhue Street house, but disbelieved the statement that he was alone and unarmed — it was because the jury already had evidence that Penunuri was accompanied by someone and that he, Penunuri, was the one carrying the gun, as he had a few hours before in the Ralphs parking lot and at Hornell Street. Delaloza's untrustworthy statement did not add to that inculpatory evidence.

41

We have also concluded above that the trial court's instructional error with regard to Delaloza's accomplice testimony was harmless. Given the totality of the trial court's instructions and statements, the jury likely understood that such testimony required corroboration and should be viewed with caution, and in any case, the statements were corroborated by other evidence presented at trial. This error, considered cumulatively with the others, does not alter the conclusion that there is no basis for overturning Penunuri's conviction for the murders of Molina and Murillo.

The concurring and dissenting opinion, while agreeing that the admission of Delaloza's testimony did not affect the guilt phase verdict, argues that the error requires reversal of the penalty phase verdict because that testimony would have made the jury more certain it was Penunuri who shot Molina and Murillo and therefore more likely to impose a death sentence. As an initial matter, we note that the concurring and dissenting opinion takes the view that the erroneous admission of Delaloza's testimony can be harmless as to Penunuri's guilt only if there is overwhelming, lawfully admitted evidence that Penunuri was the shooter in the Molina and Murillo murders. (Conc. & dis. opn., *post*, at p. 6, citing *People v. Anderson* (1987) 43 Cal.3d 1104, 1127–1129; *id*. at pp. 15–16 & fn. 3 [collecting cases].) But the concurring and dissenting opinion does not explain why the strength of the prosecution's case should be the *only* factor in determining whether a confrontation clause error affected the verdict, or why the content and credibility of the erroneously admitted evidence cannot be a critical factor in some cases.

More fundamentally, as the concurring and dissenting opinion acknowledges, the overwhelming evidence standard has no application to the penalty phase of a capital trial, where the prosecutor had no burden to prove that the defendant was the shooter or any other particular fact about the capital crimes.

42

Rather, our function in considering whether the erroneous admission of Delaloza's testimony affected the penalty phase verdict is not to determine whether there is overwhelming evidence that Penunuri was the shooter, but whether there is a reasonable possibility that had the erroneously admitted evidence been excluded, the jury would have voted for life without parole instead of death. (See *People v. Cowan* (2010) 50 Cal.4th 401, 491.) We conclude there is not.

First, as noted, Delaloza's statement incriminated Penunuri only if the jury had discounted several lies of which it would have been aware, while selectively crediting other parts of his statement. Because Penunuri had openly displayed a gun twice that night, at the parking lot robbery and again while threatening Arias at Hornell Street, the jury would have known that Delaloza was lying about being unaware whether Penunuri was carrying a firearm. The jury also knew he was lying about going to Goodhue Street with the innocent purpose of talking to a gang member's ex-girlfriend. And the jury knew his statement that only Penunuri entered the backyard of the Hornell Street house was contradicted by Walker's testimony about two men running from the house after the shots were fired. The jury in all likelihood recognized Delaloza's statement as a mendacious account of the facts tailored to absolve him of all criminal liability. Indeed, Penunuri's counsel during closing argument underscored the obvious point that "Mr. Delaloza is lying and minimizing his role in this event when he talks to the police." The concurring and dissenting opinion does not explain why the jury would have disbelieved some of Delaloza's statements but not others.

This lack of credibility may explain why the prosecutor, in his extensive and detailed rebuttal of the defense's contention that Delaloza may have been the shooter, made only a single passing reference to Delaloza's statement, and then only about what Delaloza said he was wearing that night. Instead, the prosecutor emphasized the properly admitted evidence that strongly pointed to Penunuri as

43

the shooter. This evidence included Penunuri's and not Delaloza's possession of a gun on the day in question during the Ralph's parking lot robbery and the Hornell Street assault, Luke Bissonnette's eyewitness identification, Penunuri's status as a leader of the gang, the fact that Delaloza was driving the Cadillac on Hornell Street, the inconclusiveness of the gunshot residue test performed a year after the murder, and the defense's decision not to test Delaloza's clothing for gunshot residue. And even the one fact the prosecutor highlighted from Delaloza's statement — that on the night of the murders he was wearing a sweatshirt and Penunuri was wearing a dark black jacket — was cumulative of more reliable testimony by Roxanne Bissonnette about what she saw the two of them wearing when she encountered them on Hornell Street shortly before the murders.

Moreover, to the extent that the penalty phase jury, with or without Delaloza's testimony, had a lingering doubt about who shot Murillo and Molina because of the lack of eyewitnesses, the jury also would have been acutely aware that the lack of witnesses was attributable to the fact that the one person potentially willing and able to report what had happened that night — Jaime Castillo — had been murdered at Penunuri's behest precisely in order to prevent him from making that report. As the prosecutor argued, the fact that Castillo "was killed so that Dozer could get away with double murders" was "a significant factor in aggravation which warrants the death penalty in and of itself" and "cannot be overcome by any mitigating factor that we've heard in this particular case." Nor was there any question that Penunuri played a leading role in the murders. As noted, these were murders of mistaken identity, with Luke and Arias as the intended targets. It was Penunuri who ordered Luke into the car at Hornell Street, Penunuri who waved a gun in Arias's face (likely the same nine-millimeter handgun he used during the parking lot robbery), and Penunuri who asked Luke's mother his whereabouts. At every point of which the jury was aware, it was

44

Penunuri who was in command, and the jury had every reason to believe it was Penunuri who instigated the pursuit of Luke and Arias to Goodhue Street for the purpose of murdering them. Thus, even assuming the jury would have had lingering doubt at the penalty phase about the identity of the shooter in the absence of Delaloza's false testimony, it is highly unlikely such doubt would have led the jury to a different penalty verdict.

Finally, despite what the concurring and dissenting opinion contends, Penunuri does not raise on appeal the claim that even if the convictions for the Molina and Murillo murders are affirmed, the enhancement for personally using a firearm (former § 12022.5, subd. (a)(1)) independently should be reversed with respect to those murders because of improperly admitted evidence. Accordingly, we decline to address this claim.

## IV. PENALTY PHASE

### A. Exclusion from a Portion of the Penalty Phase Closing Argument

Penunuri and codefendant Castro were jointly tried at the penalty phase through the close of evidence. At the beginning of closing arguments, Castro was not present due to administrative problems, and the trial court decided to proceed with Penunuri's closing arguments and so informed the jury. The jury began deliberating Penunuri's penalty after closing argument. While this was occurring, the court, outside the jury's presence, informed counsel of his intention to bring the jury back to hear Castro's closing arguments, but without Penunuri present. Penunuri's counsel made no objection. Penunuri now claims it was error to exclude him from Castro's closing argument.

Section 977, subdivision (b)(1), provides that with certain exceptions not relevant here, "in all cases in which a felony is charged, the accused shall be personally present at the arraignment, at the time of plea, during the preliminary

hearing, during those portions of the trial when evidence is taken before the trier of fact, and at the time of the imposition of sentence.  The accused shall be personally present at all other proceedings unless he or she shall, with leave of court, execute in open court, a written waiver of his or her right to be personally present. . . ."  (See also § 1043 [requiring a defendant's presence of felony trial subject to certain exceptions].)  We have held that "[n]either the state nor the federal Constitution, nor the statutory requirements of sections 977 and 1043, require the defendant's personal appearance at proceedings where his presence bears no reasonable, substantial relation to his opportunity to defend the charges against him."  (*People v. Butler* (2009) 46 Cal.4th 847, 861.)

There is no question that Penunuri did not waive his right to be present during Castro's closing argument.  Nor did counsel's failure to object forfeit the claim.  (See *People v. French* (2008) 43 Cal.4th 36, 46–47 [no forfeiture of claim for failure to object when express waiver is required].)  The Attorney General acknowledges that closing argument is a critical stage of the trial (cf. *Herring v. New York* (1975) 422 U.S. 853, 858 ["There can be no doubt that closing argument for the defense is a basic element of the adversary factfinding process in a criminal trial"]), but he argues that a closing argument *for a codefendant* is not a critical stage and that Penunuri therefore had no right to be present.  Penunuri's counsel points to the fact that the prosecutor in particular, and to a lesser degree Castro's defense counsel, made a number of disparaging references to Penunuri during closing argument as the instigator of the conspiracy to murder Castillo in which Castro participated. In this case, the interrelationship between codefendants that made a joint trial appropriate makes it difficult to distinguish, for purposes of the right to be present, between a defendant's closing argument and that of his codefendants; both may be critical to each defendant.  Therefore, we hold that the

46

trial court erred in failing to obtain Penunuri's personal waiver before excluding him from the courtroom during Castro's closing argument.

"[S]tate law error at the penalty phase of a capital case requires reversal only when there is a 'reasonable (i.e., realistic) possibility' the error affected the verdict. (*People v. Brown* [(1988)] 46 Cal.3d [432,] 447–448.) That standard is 'the same, in substance and effect,' as the harmless-beyond-a-reasonable-doubt standard of *Chapman v. California* [(1967)] 386 U.S. [18,] 24." (*People v. Cowan*, *supra*, 50 Cal.4th at p. 491.) We conclude the error was harmless beyond a reasonable doubt. Penunuri does not contend that his presence during Castro's closing argument would have altered the content of those arguments. He contends that his absence from those proceedings "reasonably showed a lack of interest in the proceedings at a critical stage." But there is no reason to think the jury would infer such lack of interest rather than simply attributing his absence to the fact that it was his codefendant's closing argument. Even if the jury believed Penunuri lacked interest in hearing Castro's closing argument, we see no reasonable possibility that this lack of interest, in the context of the totality of the evidence, would have exerted any influence over the jury's penalty decision.

Penunuri also argues that the jury was unable to assess his demeanor during Castro's closing argument. But the jury had ample opportunity to assess his demeanor during the penalty phase trial, including at all times when evidence was taken. It is not reasonably possible that the inability to observe his demeanor during Castro's closing argument would have swayed the verdict.

## B. Claimed Deprivation of Individualized Sentencing

Penunuri contends that the jury did not render an individualized penalty verdict because the jury was invited to compare his culpability with that of Castro,

47

his less culpable codefendant. We conclude the jury was adequately informed of its responsibility to render an individualized sentence.

Penunuri had been convicted of the murders of Murillo and Molina, as well as the conspiracy to murder Castillo. Castro was convicted of the murder of Castillo. They were jointly tried before the same penalty phase jury. On December 21, 2000, at the close of evidence and just before adjourning for the long Christmas weekend, the trial court admonished the jury "not to decide the case" but reminded the jury, among other things, to "realize that there are two separate people here, in that each of them is entitled to a trial as if he were the only person. So what you decide against one person should not be carried over into the decision of the other person, *unless you feel it is appropriate*." The court then said: "But you must give each one individual trial. . . . I'll instruct you more fully on that."

The Eighth Amendment to the federal Constitution requires an individualized determination of the appropriate penalty in a capital trial. (*Lockett v. Ohio* (1978) 438 U.S. 586, 604–605.) Absent a showing of gross unfairness, a joint penalty phase trial tried to the same jury does not deprive a defendant of such individualized determination when the jury is instructed to consider the evidence separately as to each defendant and to decide separately the question of penalty as to each defendant. (*People v. Taylor* (2001) 26 Cal.4th 1155, 1174.) Penunuri claims that the trial court improperly invited the jury to make a comparison between him, who was convicted of three murders, with Castro, who was convicted of one murder and who arguably had more mitigating evidence in his favor, by telling the jury that what they "decide against one person should not be carried over into the decision of the other person, *unless you feel it is appropriate*."

Although the Attorney General concedes that the trial court misspoke in adding the italicized phrase, he contends that the court's instructions overall were adequate to inform the jury about the need for individualized sentencing. We agree. The trial court's remark about the decision as to one defendant not being "carried over" to the other "unless you feel it is appropriate" must be considered in the context of the trial court's subsequent formal instructions. In those instructions, the court said: "You'll recall during the guilt phase of the trial, and perhaps during this phase as well, that I mentioned . . . to you that each of the defendants is to be tried as though he were the only defendant. And that your verdict should be rendered against one defendant without regard to what verdicts you rendered as to other defendants." The court further instructed, after explaining the weighing of aggravating and mitigating circumstances to decide the appropriate penalty, that "[i]n this case you must decide separately the question of penalty as to each defendant." In light of these instructions, we do not believe the jury could have been led astray by the trial court's earlier remark.

Penunuri also contends that such unfair comparison was encouraged when the jury was interrupted in its deliberations over his penalty with closing argument pertaining to the arguably less culpable Castro. Penunuri points to remarks by the prosecutor during closing argument in which he mentions the Murillo and Molina murders, thereby reminding the jury of Penunuri's greater culpability. But the closing argument of both the prosecutor and Castro's defense counsel, read as a whole, were overwhelmingly focused on Castro and did not invite comparison between the codefendants.

### C. Expression of Opinion of Victim's Relatives Regarding the Appropriate Sentence

As noted, the prosecution called several relatives of the murder victims to testify as to the impact of the murder on their lives. At the close of testimony by

49

Molina's father, John Molina, the prosecution asked: "And in your own mind, and in your heart, what do you feel is the appropriate penalty for this jury to impose on Richard Penunuri?" Molina responded: "That's not for me to say."

Following this exchange, outside the presence of the jury, defense counsel objected to this line of questioning on the ground that it might elicit from family members expressions of a desire for vengeance. Counsel argued that such an expression would be contrary to the instructions the jury was receiving that the penalty phase determination "is not a question of revenge." The trial court disagreed, opining that both defense and prosecution witnesses should be able to express their opinion about the appropriate penalty.

Subsequently, the prosecutor asked Castillo's father, Javier Castillo, if there was "anything else that you feel that this jury should know in evaluating a penalty for the killer of your son Jaime Castillo?" Castillo responded: "I have no objections [to] the penalty that they are seeking. . . . I believe that these individuals . . . especially Mr. Penunuri, . . . became very influential when he was in the jailhouse and being [so] influential, he gave the order to kill my son. And I don't think he should be given that same opportunities to the same thing again."

Asked a similar question, Castillo's stepmother, Linda Castillo, responded: "I am for the death penalty. I want these people to be killed [by] lethal injection. But it's a shame that the penalty takes so long and the system lets these people take advantage of the time they have."

Penunuri contends it was error to allow these witnesses to express their views about the appropriate penalty. Although testimony by a victim's family members at the penalty phase of a capital trial regarding the impact of the murders is constitutionally permissible, "the admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence violates the Eighth Amendment." (*Payne v. Tennessee* (1991) 501 U.S.

50

808, 830, fn. 2.)  Here, the trial court erroneously permitted the prosecution to ask questions designed to elicit from the victims' family members their opinions of Penunuri and the appropriate sentence for him.

The Attorney General contends the claim is forfeited because defense counsel did not object to the statements of Javier and Linda Castillo.  We disagree.  Although defense counsel did not articulate the constitutional basis of his objection, he correctly brought to the court's attention the inappropriateness of the witnesses' expressions of revenge and the conflict they posed to the jury instructions.  The trial court had expressed the view that this type of testimony was appropriate, and further objection would have been futile.  (See *People v. Anderson* (2001) 25 Cal.4th 543, 587 ["Counsel is not required to proffer futile objections"].)

Nevertheless, we conclude that the erroneously admitted testimony was harmless beyond a reasonable doubt.  These brief statements by family members were a small part of the prosecution's case and were not relied on by the prosecutor during closing argument.  In the context of the totality of the evidence, we see no reasonable possibility that the jury would have reached a different penalty verdict without the admission of these statements.

### D.  Insufficient Evidence of Assault Introduced in Aggravation

#### 1.  *Background*

In addition to the circumstances of the crime, the prosecution introduced evidence of an uncharged crime pursuant to section 190.3, factor (b).  That crime was the armed assault against R.J. Uzel that occurred approximately two months before the murders of Murillo and Molina.  In the evening of May 20, 1997, Uzel, Debra Recio, and a male friend (identified by Recio as "some guy Mike") were driving in the City of South Whittier.  Recio was driving Uzel's vehicle and

51

parked in a McDonald's parking lot so that Uzel could use a pay phone. Uzel and the male friend exited the vehicle, and Uzel used the pay phone. Uzel was approached by someone while using the phone.

Uzel and his male friend returned to the car and got inside. Recio was already in the driver's seat. As Recio pulled out of the parking lot, bullets came through the window on the passenger side of the car. The bullets shattered the glass, went through Uzel's leg, and skimmed Uzel's chest. Recio drove them to Whittier Hospital, where Uzel was treated for his wounds.

In a hearing pursuant to Evidence Code section 402 on whether the Uzel assault should be admitted under section 190.3, factor (b), Recio was asked if she recalled exactly what Uzel had said when he left the hospital a day later. She replied: "Not exactly. I just know that . . . It happened so long ago, all I remember him it [*sic*] was Dozer, and he was trying, they were trying to figure out how they could get back at Cole Street for shooting at them, vice versa." She did not see who had fired the shots. She also said that after she had returned from the hospital, "a friend of mine had told me that it was Dozer. I don't know who Dozer was . . . all I knew was Dozer."

Before the jury, Recio testified that when Uzel got out of the hospital, "it was out on the street that Dozer, whoever Dozer was, from Cole Street had [done] it. [Uzel] did not come straight out [and say] it was Dozer." She testified that she never heard Uzel tell her from his personal knowledge that he knew who the shooter was.

Uzel also testified. He admitted that he had refused to testify voluntarily and was in court on a subpoena. He also claimed that he did not see who had shot him. He testified that before the shooting, while he was talking on a pay phone outside the McDonald's, a person approached him. He said that he did not recognize the person, and other than the fact that the person was a male, he either

52

could not remember or could not tell anything about the person, including his age or ethnicity. He said that it was around 8:00 p.m. and dark outside. He said the corner at which the incident occurred was a busy intersection with streetlights, but that he did not know the person who had approached him and also did not know if that person was the same person who had shot him.

Uzel was asked about a police report in which he had apparently said that shortly before the incident, he had been confronted by a Hispanic male who told him to get off the phone and shouted, "This is Whittier." He had also told the police that this was the man who walked up to his car and shot him. In his testimony, he denied that such an exchange had occurred and that he had told the police about such an exchange. He generally denied that he had answered any of the police questions. He said the police "kept on pressuring" him to talk and he kept refusing. He also denied that he had told the police that he did not want his assailant prosecuted because he "did not get a good look at this person." He also testified that he knew Penunuri from two years of high school. He denied he had told Recio that "Dozer" was his assailant.

Abraham Van Rood testified that he was in his car at an intersection in front of the McDonald's restaurant when he heard shots fired and saw the muzzle of a gun. He said that he heard two or three shots and saw a young man holding a gun and shooting at the car. He said the gunman ran to a vehicle and got in the passenger seat, and then the car drove away. He observed the license plate number and gave the information to Deputy Jeffrey Reiley, a police officer who responded to the call at McDonald's. The vehicle was registered to Diana H. at a Pico Rivera address. This was the address shown on the driver's license of Bermudez, one of Penunuri's gang confederates and codefendants in the Castillo murder.

## 2. *Analysis*

A capital defendant who believes that there is insufficient evidence of an uncharged offense that the prosecution seeks to introduce in aggravation under section 190.3, factor (b) must object to the admission of such evidence in order to preserve the claim of insufficiency on appeal.  (*People v. Delgado* (2017) 2 Cal.5th 544, 581–582.)  Here, counsel did object, and a hearing was held.

" ' "[A] trial court's decision to admit 'other crimes' evidence at the penalty phase is reviewed for abuse of discretion, and no abuse of discretion will be found where, in fact, the evidence in question was legally sufficient." ' "  (*People v. Tully* (2012) 54 Cal.4th 952, 1027.)  With respect to section 190.3, factor (b), evidence of an uncharged crime introduced at the penalty phase, the prosecution bears the burden of proving all the essential elements of the crime, and the jury may not consider such evidence in aggravation unless the prosecution has met its burden.  (*Tully*, at p. 1027; *People v. Boyd* (1985) 38 Cal.3d 762, 778.)  Thus, sufficient evidence in this context means substantial evidence from which a reasonable jury could have found beyond a reasonable doubt that the defendant committed the uncharged crime.

We conclude the trial court erred in allowing the jury to consider the assault against Uzel because there is insufficient evidence that Penunuri committed that assault.  There was no direct evidence linking him to the crime.  The testimony of Recio and Uzel does not establish that either of them had personal knowledge that it was Penunuri who had shot Uzel.  The fact that the car was registered to someone at an address shared with a gang confederate and codefendant is also insufficient to establish Penunuri's guilt.  The only evidence pointing to Penunuri as the perpetrator was Recio's testimony that it was "on the street" that Penunuri had been the shooter.  The jury was aware Uzel was reluctant to testify, and it is possible that statements Uzel made in his police report shortly after the shooting

54

occurred might have provided a basis for reasonably inferring that Uzel had personal knowledge of who shot him. But, as recounted above, Uzel denied he had made the statements to the police and disavowed the truth of the statements. No police officer was called to testify as to whether Uzel did indeed make the statements in the police report, and the prosecutor's statements about the police report in his questions to Uzel were not evidence. (See *People v. Samayoa* (1997) 15 Cal.4th 795, 843.)

There was an inconsistency between Recio's statement that Uzel had identified Penunuri as the shooter after he left the hospital and Uzel's denial that he made such a statement. But even if the jury believed Recio, she also denied that Uzel's identification was based on his personal knowledge. And Recio was consistent in maintaining her own lack of personal knowledge of the shooter's identity. The only evidence linking Penunuri to the Uzel assault, Recio's report of rumors she heard, is not evidence "that is reasonable, credible, and of solid value" (*People v. Zamudio*, *supra*, 43 Cal.4th at p. 357) sufficient to support a jury finding beyond a reasonable doubt that Penunuri committed the assault.

For such erroneous admission of uncharged crime evidence, as for other errors at the penalty phase, we ask whether there is a reasonable possibility that the error affected the verdict, a standard essentially the same as the harmless beyond a reasonable doubt standard. (*People v. Lewis* (2008) 43 Cal.4th 415, 527 (*Lewis*).) We conclude under that standard that the admission of evidence of the Uzel assault was harmless. It is true that at closing argument the prosecutor referred to the assault, saying, among other things, that "Dozer even two months before the Whittier murders actually tried to . . . kill and injure Jason Uzel at that McDonald's parking lot on May 20th, 1997. That kind of tells you what kind of person Dozer was. Or still is, for that matter."

55

Nonetheless, the jury in this case was properly instructed according to CALJIC No. 8.87 that evidence of the Uzel assault could not be considered in aggravation unless the jury was satisfied beyond a reasonable doubt that Penunuri did in fact commit the assault. Given the lack of sufficient evidence, it appears unlikely that the jury would have found beyond a reasonable doubt that Penunuri committed the assault. In an analogous situation, this court has concluded that when the jury was instructed on two theories of criminal liability, and only one was supported by the substantial evidence, we can rely on the jury to reject the theory with inadequate evidentiary support, and we will not overturn a jury verdict absent an affirmative showing of a reasonable probability that the defendant was found guilty on the erroneous theory. (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129, 1131.) *Guiton* involved ordinary state law error, in which a defendant has the burden of demonstrating a reasonable probability of prejudice from the error. (*Id.* at p. 1130.) It is an open question whether the unlikelihood that the jury significantly relied on evidence of the Uzel assault allows us to be confident beyond a reasonable doubt that the jury did not so rely.

But more fundamentally, the assault evidence was dwarfed by the prosecution's primary aggravating evidence: the capital crimes themselves, i.e., the murders of Molina and Murillo as well as Penunuri's role in instigating the conspiracy to murder Castillo to silence a witness. We therefore conclude that because it is unlikely the jury found beyond a reasonable doubt that Penunuri committed the Uzel assault, and because the prosecution's case rested mainly on evidence related to the three murders, the error of admitting the Uzel assault was harmless beyond a reasonable doubt.

56

### E. Failure to Define Reasonable Doubt at the Penalty Phase

As noted, the jury in this case was properly instructed according to CALJIC No. 8.87 that evidence of uncharged crimes must be proven beyond a reasonable doubt before such crimes can be considered in aggravation at the penalty phase. The jury was given CALJIC No. 2.90 regarding the meaning of reasonable doubt during the guilt phase, but that instruction was not repeated at the penalty phase. Furthermore, the trial court told the jury at the beginning of the penalty phase instructions in open court to "[d]isregard all other instructions given to you in other phases of this trial."

Penunuri is correct that the trial court erred in failing to furnish a reasonable doubt instruction at the penalty phase. "Normally, a trial court must instruct the jury on general principles of law that are closely and openly connected with the facts and necessary for the jury's understanding of the case, even absent a request from the defendant. [Citation.] Thus, if a trial court instructs the jury at the penalty phase not to refer to instructions given at the guilt phase, it later must provide the jury with those instructions applicable to the evaluation of evidence at the penalty phase." (*Lewis*, *supra*, 43 Cal.4th at p. 535.) Because evidence of an uncharged crime was introduced at the penalty phase, the trial court should have instructed as to the meaning of reasonable doubt according to CALJIC No. 2.90. (See *Lewis*, at p. 534.)

But the error was harmless because "[t]here is no reasonable possibility the jury would have believed that the reasonable doubt standard it was required to apply at the penalty phase was any different than the standard it had just applied at the guilt phase . . . ." (*Lewis*, *supra*, 43 Cal.4th at p. 536; see also *People v. Cowan*, *supra*, 50 Cal.4th at pp. 494–495.) Penunuri contends this case is different because the trial court gave the instruction that the prosecution does not bear the burden of proof at the penalty phase of the trial. This instruction, while

57

generally correct, does not apply to uncharged crime evidence, for which the prosecution does bear the burden of proof beyond reasonable doubt. Yet the jury, which was specifically instructed that it must be convinced beyond a reasonable doubt that Penunuri did in fact commit the assault against Uzel, would have understood it was the prosecutor's burden to convince the jury beyond a reasonable doubt. There is no reasonable possibility that the jury misunderstood its role in eliminating from consideration evidence of any uncharged crime when that crime had not been proven by the prosecution beyond a reasonable doubt.

### F. Constitutional Challenges

Penunuri raises several constitutional challenges to the death penalty statute that we have previously rejected. The California death penalty statute is not impermissibly broad, whether considered on its face or as interpreted by this court. (*People v. Masters* (2016) 62 Cal.4th 1019, 1077 (*Masters*).) Section 190.3, factor (a), regarding the circumstances of the crime, whether on its face or as interpreted and applied, does not permit the arbitrary and capricious imposition of a sentence of death. (*Masters*, at p. 1077.)

The California death penalty statute is not invalid for failing to require (1) written findings or unanimity as to aggravating factors, (2) proof of all aggravating factors beyond a reasonable doubt, (3) findings that aggravation outweighs mitigation beyond a reasonable doubt, or (4) findings that death is the appropriate penalty beyond a reasonable doubt; nor do the decisions in *Ring v. Arizona* (2002) 536 U.S. 584, *Apprendi v. New Jersey* (2000) 530 U.S. 466, *Blakely v. Washington* (2004) 542 U.S. 296, and *Cunningham v. California* (2007) 549 U.S. 270 affect the validity of California's death penalty law. (*Masters*, *supra*, 62 Cal.4th at p. 1076; *People v. Moore* (2011) 51 Cal.4th 1104, 1145.) Review for intercase proportionality is not constitutionally compelled. (*Masters*,

*supra*, 62 Cal.4th at p. 1076.) We have repeatedly upheld the constitutionality of using unadjudicated criminal activity under section 190.3, factor (b) at the penalty phase. (*People v. Duff* (2014) 58 Cal.4th 527, 563.) The jury need not make a unanimous finding under section 190.3, factor (b). *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1068.)

Use of the adjectives "extreme" and "substantial" in section 190.3, factors (d) and (g) is constitutional. (*Masters*, *supra*, 62 Cal.4th at p. 1077.) "The trial court was not constitutionally required to inform the jury that certain sentencing factors were relevant only in mitigation, and the statutory instruction to the jury to consider 'whether or not' certain mitigating factors were present did not impermissibly invite the jury to aggravate the sentence upon the basis of nonexistent or irrational aggravating factors." (*People v. Morrison* (2004) 34 Cal.4th 698, 730.)

" 'Because capital defendants are not similarly situated to noncapital defendants, California's death penalty law does not deny capital defendants equal protection by providing certain procedural protections to noncapital defendants but not to capital defendants. [Citations.]' " (*Masters*, *supra*, 62 Cal.4th at pp. 1076–1077.) " 'The alleged inconsistency between regular imposition of the death penalty and international norms of human decency does not render that penalty cruel and unusual punishment under the Eighth Amendment [citation]; nor does "regular" imposition of the death penalty violate the Eighth Amendment on the ground that " '[i]nternational law is a part of our law' " [Citation.].' " (*Id.* at pp. 1077–1078.)

## G. Cumulative Error

Penunuri contends that the cumulative effects of the errors occurring at the guilt and penalty phases require reversal of the death judgment because it violates

due process, the right to a jury trial, and the prohibition against cruel and unusual punishment under both the United States and California Constitutions. We have concluded that the erroneous admission of Delaloza's and Arias's testimonial statements were harmless beyond a reasonable doubt at the guilt phase and that an erroneous accomplice instruction was likewise harmless. We have also determined that the admission of Delaloza's statements was not prejudicial at the penalty phase. In addition, we have concluded that there was no reasonable possibility that the erroneous admission of the assault against Uzel and the testimony by victim family members about the appropriate penalty affected the penalty phase verdict. Nor was there a reasonable possibility that the jury misunderstood its charge to consider unadjudicated criminal conduct in aggravation only if the prosecution proved such conduct beyond a reasonable doubt. Nor, notwithstanding an isolated inappropriate remark, did the trial court's statements and instructions considered in their totality lead the jury to believe that comparison of Penunuri's culpability with that of his codefendant Castro was relevant to its assessment of the proper penalty. Nor was there a reasonable possibility that Penunuri's absence during codefendant Castro's penalty phase closing argument affected the verdict. We conclude that there is no reasonable possibility that these errors, considered cumulatively, affected the penalty verdict.

## V. CONCLUSION

The judgment is affirmed.

**LIU, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**KRUGER, J.**
**WILLHITE, J.**\*

---

\*      Associate Justice of the Court of Appeal, Second Appellate District, Division Four, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**CONCURRING AND DISSENTING OPINION BY CUÉLLAR, J.**

The prosecutor sought to convince the jury in this case not only that defendant Richard Penunuri was guilty of murder, but that he actually pulled the trigger of the gun that killed Brian Molina and Michael Murillo. So when the trial court erroneously allowed in the accomplice's police statements shifting all the blame to Penunuri — without ever giving him an opportunity to cross-examine the accomplice — it exposed the jury to critical information supporting the prosecution's theory that Penunuri must have been the triggerman. It is, at best, highly speculative to presume that the death sentence was just as likely even if the jury had rejected the prosecution's theory that Penunuri pulled the trigger. There is no basis for treating the mistaken admission of these statements as a minor rounding error in the evidentiary calculus.

In theory, a person found guilty of a murder involving special circumstances is eligible for the death penalty regardless of whether the person was the actual killer or merely aided and abetted the murder. (See Pen. Code, § 190.2.) In practice, juries are less willing to vote for death when the defendant's role involved aiding and abetting the commission of a murder by another. Because penalty trials ask jurors to make moral judgments about how to align a particular crime with a suitable punishment and not simply legal determinations of eligibility, it is no surprise that an accomplice to a murder "is far less likely to receive the death penalty than the triggerman." (*People v. Garcia* (1984) 36 Cal.3d 539, 546.)

Which is why the prosecutor found it so crucial in this case not only to show Penunuri participated in the Molina and Murillo double murder, but to establish he was the triggerman. By the time the penalty phase began, Penunuri already stood convicted of three murders: the Molina and Murillo murders in the backyard of a house on Goodhue Street in Whittier, and the murder of Jaime Castillo in the San Gabriel Mountains three months later. The prosecution conceded that Penunuri — who was in custody at the time — did not personally kill Castillo. Instead the prosecution argued Penunuri enlisted his codefendants in carrying out the murder of Castillo to eliminate him as a witness. But to raise the likelihood of a death verdict, the prosecution theorized that it was Penunuri who shot and killed Molina and Murillo — and that he did so in a cold and inhuman manner. Time and again, the prosecutor told the jury not only that Penunuri was criminally involved in the scheme that led to the victims' deaths, but that Penunuri "was actually the triggerman," that "[h]e was the person who pulled the trigger." The prosecutor argued that the location of Molina and Murillo's gunshot wounds — as well as the shooter's failure to give the victims a chance to plead for their lives or defend themselves — was evidence of the shooter's "brutal," "merciless," and "unforgivable" conduct. Indeed, the prosecutor posited that even if the jury discounted all the other crimes and aggravating evidence, "the way that Brian died" — awakened in the middle of the night by the shooting of his friend, chased down, and then shot nine times — "is a factor in aggravation beyond compare which warrants the death penalty in and of itself."

So if anyone understood just how critical the shooter's identity was to the People's case for death, it was the prosecutor. The best evidence pegging Penunuri as the triggerman in the Molina and Murillo murders was the taped statement of his accomplice, Alejandro Delaloza. Indeed, Delaloza's statement made it plain to the jury that Penunuri *had* to be the shooter. According to

2

Delaloza, he and Penunuri were the only people in the car when it arrived at the murder scene on Goodhue Street. According to Delaloza, it was only Penunuri who got out of the car and approached the house. And, Delaloza testified, the gunfire began just a few minutes after Penunuri got out of the car. When the shooting stopped, Penunuri came running and got back in the car. If credited, Delaloza's statement established beyond a reasonable doubt that Penunuri was the actual killer.

The People's core problem is that Delaloza did not testify in this case, and Penunuri had no opportunity to cross-examine him. In accordance with the People's concession, the majority holds — and I fully agree — that the admission of Delaloza's out-of-court statements violated Penunuri's Sixth Amendment right to confront witnesses. I also concur with the majority that there is no reasonable possibility this error affected the Molina and Murillo murder convictions. Properly admitted evidence overwhelmingly showed that Penunuri was at the murder scene and, even if not the triggerman, aided and abetted the murders by serving as a lookout or by blocking the victims' escape.

What I do not understand and cannot accept, though, is the majority's failure to seriously consider what effect this error had on the firearm use enhancement[1] and the penalty determination that resulted in a death judgment against Penunuri. In the absence of his co-perpetrator's statements, one cannot say

---

[1] Penunuri argues that the error in admitting Delaloza's statement "requires reversal of [his] convictions in counts 1, 2, 4 and 5." Count 4, which charged the Molina murder, included an allegation that Penunuri personally used a firearm. Count 5, which charged the Murillo murder, likewise included an allegation that Penunuri personally used a firearm. Nowhere did Penunuri state that his challenge to the convictions in counts 4 and 5 *excluded* the use enhancements specifically recited in those counts. Indeed, he argued at length in his briefing that Delaloza's statements were wrongfully used to implicate him as the gunman and exclude Delaloza. I therefore do not understand how or why the majority can say that this claim was not raised on appeal.

3

with confidence that the jury here would have concluded that Penunuri was the shooter. The jury would have been left with nothing more than the fact that Penunuri had been in possession of a gun earlier that night — and without facts to establish that Penunuri was the *only* person in the Cadillac who was armed. This is far too thin a reed on which to support the jury's enormously consequential decision to impose a death judgment. Because the Sixth Amendment error likely skewed the jury's assessment of the appropriate penalty, I respectfully dissent.

## I.

The evidence concerning Penunuri's role in the Molina and Murillo murders was entirely circumstantial. The prosecution established that fellow gang members Penunuri, Delaloza, and Castillo had been together in Delaloza's white Cadillac when they robbed two people in a Ralphs market parking lot — and again, a few hours later, when Penunuri intimidated Luke Bissonnette (a lapsed gang member) and pointed a gun at Bissonnette's friend, Carlos Arias, outside a Hornell Street home. Bissonnette and Arias ran away and ended up at Laraine Martinez's nearby home on the north-south segment of Goodhue Street. They joined a larger group, which included eventual murder victims Molina and Murillo, on the back patio and talked for a while. Molina and Murillo were sleeping, and remained so when the rest of the group went inside.

Sometime later, a white Cadillac drove up and parked on the east-west segment of Goodhue Street, about one house away from Martinez's house. Suddenly, the people in Martinez's house heard gunfire. After the gunfire stopped, Bissonnette looked out his front window and caught a glimpse of someone across the street who, from the back, looked like Penunuri. Meanwhile, neighbor Matthew Walker, who lived on the east-west segment of Goodhue Street, noticed the empty Cadillac and then spotted two men exit the backyard of

4

Martinez's house from the side and enter the car.  Molina and Murillo had been shot on the patio:  Murillo as he slept, and Molina as he tried to escape.

The next day, police seized a large black jacket from Penunuri's bedroom. The jacket resembled the jacket Bissonnette had seen on the man across the street shortly after the shooting.  But police also had found a black jacket at Delaloza's residence, along with keys to a white Cadillac, fruits of the Ralphs robbery, and a plastic box of nine-millimeter ammunition with some bullets missing.  Ballistics tests showed that the victims had each been shot with the same nine-millimeter semiautomatic pistol.  Penunuri's jacket was tested for gunshot residue; none was found.  Delaloza's jacket was never tested.

Recordings of two jailhouse meetings between Penunuri and his mother were played for the jury.  In the first, they appeared to be discussing a possible alibi.  In the second, Penunuri said that Castillo had been with them at the Ralphs parking lot and had probably been with Delaloza later that night, "cause look at where he's at . . . he died . . . someone killed him."

## II.

The Sixth Amendment's confrontation clause guarantees a criminal defendant's right "to be confronted with the witnesses against him."  (U.S. Const., 6th Amend.; see *Pointer v. Texas* (1965) 380 U.S. 400, 406.)  The "principal evil" at which the clause is directed was the "use of *ex parte* examinations as evidence against the accused" (*Crawford v. Washington* (2004) 541 U.S. 36, 50) — like the taped interview of Delaloza.  As the majority acknowledges, " 'Unconfronted accomplice statements to authorities [are] "core testimonial statements that the Confrontation Clause plainly meant to exclude." ' "  (Maj. opn., *ante*, at p. 34.)

Such evidence tends to be fundamentally unfair.  We considered why in *People v. Anderson* (1987) 43 Cal.3d 1104.  Erroneous admission of a co-perpetrator's extrajudicial statements " 'can have "devastating" consequences to a

5

nonconfessing defendant, adding "substantial, perhaps even critical, weight to the Government's case." . . . Such statements go to the jury untested by cross-examination and, indeed, perhaps unanswered altogether unless the defendant waives his Fifth Amendment privilege and takes the stand.' " (*Anderson*, at p. 1127.) Consequently, to determine whether an error of this type is harmless beyond a reasonable doubt, we developed a two-part "rule" requiring the People to show "the properly admitted evidence is overwhelming and the incriminating extrajudicial statement is merely cumulative of other direct evidence." (*Id*. at p. 1129; see *People v. Jennings* (2010) 50 Cal.4th 616, 652 ["There was overwhelming circumstantial evidence apart from [the declarant's] statement"]; *id*. at p. 653 ["There was overwhelming direct and circumstantial evidence establishing that . . . defendant also brutally and continuously physically abused [the victim]"]; *ibid*. ["Defendant did not dispute that he starved and physically abused [the victim]"]; *id*. at p. 655 [the declarant's "statements were merely cumulative of actual and adoptive admissions made by defendant during the videotaped joint interview"]; *People v. Burney* (2009) 47 Cal.4th 203, 232 [quoting *Anderson*].) The People have not satisfied either part of the rule: They have not shown that properly admitted evidence of the shooter's identity is overwhelming, nor have they shown that Delaloza's statement was cumulative of other direct evidence.

In fact, the case for Penunuri being the shooter — apart from Delaloza's statement — was strikingly meager. There were no eyewitnesses to the shooting, nor was there a single piece of physical evidence tying Penunuri to the crime. The prosecution hammered home the theory that Delaloza was the getaway driver, leaving Penunuri as the shooter. Support for this theory depended crucially — as the prosecutor himself conceded — on Delaloza's own statement that he was driving the Cadillac when they arrived at Goodhue Street. Forced to put aside this

6

direct evidence, the majority suggests the jury could have inferred Delaloza was the driver from Bissonnette's properly admitted testimony that Delaloza was driving when the white Cadillac arrived at the Hornell Street house prior to the shooting. (Maj. opn., *ante*, at pp. 18-19.) But according to Randy Cordero, one of the robbery victims at Ralphs a few hours earlier, *Penunuri* was driving the Cadillac at that time. So it would be difficult to say which man — Penunuri or Delaloza — was driving when they arrived at Goodhue Street, which (according to the witnesses) was some 90 minutes to three and a half hours after the Hornell Street incident.

Even if we assumed Delaloza was indeed the driver when the men arrived at Goodhue Street, we would still be hard-pressed to say which of the men was the shooter. Without Delaloza's improperly admitted testimony, absolutely no evidence indicated that anyone remained in the car during the shooting. Matthew Walker, a neighbor, heard gunfire and looked out his front window to find a white Cadillac parked on the east-west segment of Goodhue Street. He then spotted two individuals exit the backyard across the street and enter the empty Cadillac. Walker watched as the car proceeded eastbound on Goodhue, then around the bend and northbound on Goodhue until it went out of sight.

What makes identification of the shooter even more fraught in this case is the reasonable possibility — based on properly admitted testimony — that a *third* individual may have been involved. Luke Bissonnette testified that he briefly glimpsed a man in a dark, heavy jacket with a hood on a *different* part of Goodhue Street — the north-south segment — across the street from his house after the shooting. Based on the jacket, the silhouette, and the back of the man's head — and nothing else — Luke identified the man as Penunuri. As the defense pointed out, there was reason to question that identification: Delaloza had a black jacket "similar" to Penunuri's, as well as a black sweatshirt with a hood; an off-duty

7

officer who spotted the white Cadillac earlier that night testified that the driver and the front passenger were "dressed in the same fashion," each wearing a big, bulky jacket "consistent with" Penunuri's jacket; and a defense expert testified that the prevailing conditions rendered Luke's identification of Penunuri as the man across the street "very unreliable." But even if the identification inspired confidence, it would not demonstrate that Penunuri — as opposed to one of the two other men at the scene — was the triggerman.

To bolster its contention that Delaloza's testimony was inconsequential to the jury's determination, the majority also relies on the evidence that Penunuri was in possession of a gun during the Ralphs robbery and during the Arias assault on Hornell Street. (Maj. opn., *ante*, at pp. 19, 43.) This evidence would tend to support the inference that he was in possession of a gun at Goodhue Street, but such an inference is hardly an inevitable one and thus falls well short of establishing that the admission of Delaloza's statement was harmless beyond a reasonable doubt. Nor can the majority get much mileage out of Cordero's assertion that the gun he saw at the Ralphs parking lot was a nine-millimeter. Cordero was a twice-convicted felon who admitted lying under oath at an earlier proceeding relating to these very crimes.

Other evidence in this case, moreover, tended to show that Penunuri was not the only one in the Cadillac armed with a gun that night. Tammy Winters, a cashier at Ralphs who was the prosecution's first witness, testified that after Cordero retrieved a bat from the trunk of his car, she noticed one of the men from the white Cadillac reach around his right hip area. She saw something "bulky," something "that wasn't pants and it wasn't a shirt." Winters "assumed it was a gun, and so that's when I got in my car and I wanted to get the heck out of there." Winters testified that the hair length and facial hair of the man with the bulky object was consistent with *Delaloza*, not with Penunuri.

8

What seems far more significant in identifying the shooter, in my view, are two other facts. Neither points to Penunuri as the shooter — and neither is even mentioned in the majority's harmless error analysis.

First, the police found a box of nine-millimeter ammunition in Delaloza's bedroom. According to the firearm examiner, all of the expended casings and bullets found at the murder scene — as well as a live round — came from the same nine-millimeter semiautomatic pistol. So did a live round recovered from Delaloza's house. Although these casings, bullets, and rounds were manufactured by several different companies, the ammunition box found in Delaloza's bedroom contained ammunition from *each* of those companies.

Second, no gunshot residue was ever found on Penunuri's jacket — despite expert testimony that one would have expected to find it there if Penunuri had been the shooter. The defense demonstrated in court that the sleeves of Penunuri's jacket reached past his knuckles, almost to the middle of his fingers, even when his arms were extended as though shooting a gun. Lawrence Baggett, a firearm expert, testified that after firing 11 rounds, there would be gunshot residue not only on the nine-millimeter semiautomatic pistol itself, but also on the sleeves of a jacket extending that far down the shooter's hand. Baggett opined, in addition, that one would expect to find gunshot residue in a jacket pocket if the weapon had been placed in the pocket. Recall that Luke never said he saw the person across the street with a gun, which suggests that such a person — if indeed the shooter — may have placed the gun in his jacket pocket. Yet Penunuri's jacket was tested for gunshot residue on the inside and outside of both sleeves and the inside and outside of both pockets, and no particles were found.

Where (as here) the evidence of the triggerman's identity is so ambiguous, the People cannot show beyond a reasonable doubt that the jury would not have relied on Delaloza's account. The majority speculates that the jury would have

9

discounted Delaloza's statement because he subsequently "had been tried and convicted for the Goodhue Street murders." (Maj. opn., *ante*, at pp. 40-41.) But the prosecutor turned even that fact to his advantage by telling the jury that the "concept" of aiding and abetting "becomes important when we are talking about *Alejandro Delaloza* and the Goodhue Street murders. [¶] If you assist somebody in committing a crime and you know that that person is in fact committing the crime and you do something to assist them or help them, either as a lookout or either as a driver — and these are just examples — of a getaway car, you're becoming an aider and abettor." The prosecutor then seized on Delaloza's conviction to argue that the role of aider and abettor to the Molina and Murillo murders had already been filled — by Delaloza. According to the prosecutor, "[T]his helps explain why Hondo [Delaloza's nickname] eventually was convicted for the Goodhue Street murders in a separate case *as an accomplice, as an aider and abettor* to Richard Penunuri, under that law."

Considered in context, Delaloza's unconfronted statements effectively identified Penunuri to the jury as the shooter. Delaloza was clear and emphatic that at the time he saw Penunuri return, he "didn't hear any shots" and that "the shooting stopped an[d] then . . . [Delaloza] saw him coming out." Nor did Delaloza assert, as the majority mistakenly contends, "that Penunuri was unarmed." (Maj. opn., *ante*, at p. 41.) Delaloza *actually* said that while *he* didn't see Penunuri with a gun, it was nonetheless "possible" that Penunuri "coulda had" a gun and "coulda hide it."

At core, the majority seems determined to treat the confrontation clause violation as harmless merely because Delaloza's improperly admitted statements "were corroborated by other evidence presented at trial." (Maj. opn., *ante*, at p. 42.) Examine that "other evidence" closely, though, and it reduces merely to the weak inference "that he, Penunuri, was the one carrying [a] gun, as he had a few

hours before in the Ralphs parking lot and at Hornell Street." (*Id*. at p. 41.) In effect, the majority seeks to leverage the "slight" corroboration (*People v. Romero and Self* (2015) 62 Cal.4th 1, 37) of an accomplice's unconfronted statement *that should never have been admitted* into proof that the error in admitting the accomplice's extrajudicial statement was harmless beyond a reasonable doubt. This approach bears only a passing, and quite pale, resemblance to the analysis of harmlessness beyond a reasonable doubt we undertake under well-established precedent. (See *People v. Jennings*, *supra*, 50 Cal.4th at pp. 652-655; *People v. Burney*, *supra*, 47 Cal.4th at p. 232; *People v. Anderson*, 43 Cal.3d at p. 1129.)

Even worse, the prosecution actively invoked Delaloza's statement to corroborate and bolster weaknesses in its own evidence. The extent to which the prosecution relied on improperly admitted evidence proves pivotal in assessing " 'what the jury actually decided and whether the error might have tainted its decision.' " (*People v. Pearson* (2013) 56 Cal.4th 393, 463; see *People v. Grimes* (2016) 1 Cal.5th 698, 723 [relying on the prosecutor's argument to demonstrate "the centrality of the issue" to the penalty determination]; *People v. Harris* (1994) 9 Cal.4th 407, 430 ["the jury certainly was aware of the . . . arguments of counsel . . ."]; accord, *Ghent v. Woodford* (9th Cir. 2002) 279 F.3d 1121, 1131 ["The State's own actions at trial belie its current arguments regarding the importance of [the] testimony. Its actions demonstrate just how critical the State believed the erroneously admitted evidence to be"]; *Exxon Corp. v. Dep't of Conservation & Natural Res.* (Ala. 2002) 859 So.2d 1096, 1108 ["the State's emphasis on the letter throughout the trial belies any claim of harmless error"]; *State v. Walls* (Iowa 2009) 761 N.W.2d 683, 688 ["The State's assertion on appeal that the effect of the interrogation is comparatively minimal is belied by its use of the testimony at trial"].)

An examination of how the prosecution used Delaloza's unconfronted statement is thus not only essential to the harmless error inquiry, but also revealing in terms of just how essential the statement was to the prosecution's theory that Penunuri was the shooter. To firm up Luke's identification of Penunuri, which was under attack by the defense expert, the prosecutor explicitly relied on Delaloza's statement placing Penunuri at the scene. The prosecutor pointed out in particular that the defense expert had "no idea that . . . Delaloza[] actually told sheriff's investigators that [Penunuri] was in fact at that house across the street at the time of this particular identification"; stressed to the jury that "assuming hypothetically it's truthful then, . . . that corroborating evidence, assuming it's truthful, . . . only helps support what a particular witness says"; and wondered aloud to the expert, "I just don't understand why you could disregard what other people —" before an objection could be interposed to this argumentative comment about Delaloza's incriminating statement.[2]

There's more. During closing argument, the prosecutor tried to counter the defense theory that Delaloza must have been the shooter by emphasizing (once again) Delaloza's unconfronted statement: "Could have been Hondo? Could have been Alejandro Delaloza? [¶] Not likely, because Alejandro Delaloza, *through his statement*, said that he parked near the Goodhue Street house; Dozer's the one that got out of the car; Dozer's the one that went into the backyard; that's when he heard gunfire, and all of a sudden Dozer appears."

---

[2] The prosecutor's other method of shoring up Bissonnette's identification was to point out that "Carlos Arias, whose testimony was read to you, also said that it was Dozer [Penunuri's gang moniker] leaving the house." But the majority concedes, as it must, that the introduction of Arias's unconfronted statement was itself yet another Sixth Amendment violation (see maj. opn., *ante*, at p. 32) — and thus further exacerbated the prejudice Penunuri suffered in this case.

And *still* more. The prosecutor relied on Delaloza's statement to rebut concerns that Delaloza and Penunuri were dressed alike that night: "If you look at Hondo's own statement to law enforcement when he implicated Penunuri in that crime, he was describing the clothing he was wearing that night as simply being a sweatshirt, not a jacket of any kind." Indeed, the prosecutor was sufficiently anxious about the shooter's identity that his concluding argument concerning the Molina and Murillo murders focused *entirely* on the theory that Penunuri could be guilty as an aider and abettor: "The gunman, be it Richard Penunuri or one of the two other occupants, Hondo or Jaime Castillo, gets out and walks around the property toward the backyard with the gun in his hand. . . . If [the victims] try to escape and jump the block wall which separates the two properties, where are they heading? They're heading right to the trap. Right to where the two individuals are waiting, cutting off the possible route of escape. What does that tell us? . . . If it was Jaime Castillo and Dozer, or Hondo and Dozer, actually blocking off the route of escape for the possible victims, then they're acting as accomplices as well and they're just as guilty for the murder as though they pulled the trigger at the back patio area. That's accomplice liability. . . . So what does that mean if Richard Penunuri is in fact an accomplice as opposed to an actual shooter? Makes no difference if there's GSR on his coat or not. Doesn't matter. Makes no difference if Hondo is wearing a black jacket that night. And it makes no difference who was driving the car, the Cadillac."

Jurors are entitled to selectively credit a witness's statements, a prospect that becomes ever more likely when the prosecution invites them to do so. That's precisely what the prosecution did here. As the prosecution made abundantly clear, the two men did not drive to Goodhue Street for the innocent purpose of chatting up a gang member's ex-girlfriend (see maj. opn., *ante*, at p. 43), nor was Delaloza unaware that Penunuri had a gun. The prosecution conceded that those

13

aspects of Delaloza's statements were disproved by his murder convictions. But when it came to proving which of the two (or three) men at the scene was the triggerman, the prosecution resorted regularly and consistently to Delaloza's statements pointing to Penunuri. Although the majority blithely asserts it is not "likely" that the jury would have disbelieved Delaloza's self-serving statements yet still have credited his identification of Penunuri as the shooter (*id*. at p. 40), this was exactly what the prosecution asked the jury to do. (See *U.S. v. De Loach* (D.C. Cir. 1974) 504 F.2d 185, 192 [" '[A prosecutor's] own estimate of his case, and of its reception by the jury at the time, is, if not the only, at least a highly relevant measure now of the likelihood of prejudice' "].) Only by shutting its eyes and covering its ears to the argument the prosecutor presented to the jury can the majority deny the existence of — at a minimum — a reasonable possibility that the jury believed some of Delaloza's statements without accepting the veracity of others.

On this record, there was reasonable doubt whether Penunuri was the only one with a gun that night; whether he was the driver when the Cadillac arrived at Goodhue Street some hours after leaving Hornell Street; whether he (or anyone else) remained in the car during the shooting; which of the men committed the shooting; whether Penunuri and Delaloza were wearing similar jackets that night; and whether Penunuri was the man in the bulky, hooded jacket across the street after the shooting. At every juncture, though, the prosecutor invoked Delaloza's statements to neutralize these defense arguments or fill in gaps in the other, properly admitted evidence. It is a bit late in the game to speculate that the jury would have categorically discounted Delaloza's statement, when the prosecutor's argument focused so squarely on making sure that the jury believed it in critical respects. And it is difficult to square the majority's insistence on the trivial role played by Delaloza's statement with the weight and significance the prosecutor

14

very clearly thought it had. (See *People v. Grimes*, *supra*, 1 Cal.5th at p. 722; *People v. Roder* (1983) 33 Cal.3d 491, 505.)

At a minimum, the record establishes that the evidence of Penunuri's role in the murders was decidedly not overwhelming. Nor was Delaloza's statement cumulative of other, properly admitted evidence. I note that the majority nowhere claims otherwise.

**III.**

A confrontation clause violation involving the unconfronted, incriminating statements of an accomplice is harmless beyond a reasonable doubt only " 'if the properly admitted evidence is overwhelming and the incriminating extrajudicial statement is merely cumulative of other direct evidence.' " (*People v. Burney*, *supra*, 47 Cal.4th at p. 232.) The majority does not dispute that unconfronted, incriminating statements of an accomplice were improperly admitted here. Nor have the People shown that the properly admitted evidence identifying Penunuri as the shooter was overwhelming or that Delaloza's incriminating statements were merely cumulative of other, properly admitted evidence. Consequently, the People have not demonstrated that the error in admitting Delaloza's incriminating out-of-court statements was harmless beyond a reasonable doubt insofar as it affected the jury's determination of the triggerman's identity in the Molina and Murillo murders. (See *In re Sears* (1969) 71 Cal.2d 379, 387 ["the evidence submitted against defendant did not so conclusively establish his guilt that the introduction into evidence of his brother's confession did not contribute to the verdicts against him"].)[3] I would reverse the jury's finding that Penunuri

---

[3]    Accord, *U.S. v. Doherty* (11th Cir. 2000) 233 F.3d 1275, 1282 (error in admitting an accomplice's unconfronted statement "is harmless only if the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the co-defendant's statement so insignificant, that beyond any reasonable doubt

15

personally used a firearm in committing those murders.  (See Pen. Code,

§ 12022.5, former subd. (a)(1).)

The Sixth Amendment violation also infected the penalty determination.

Although the inquiry in both the guilt and the penalty phases is whether the federal

constitutional error in admitting Delaloza's statement was harmless beyond a

---

the improper use of the statement was harmless"); *U.S. v. Glass* (10th Cir. 1997)
128 F.3d 1398, 1404 (reversing the judgment where the improper admission of an
accomplice's police statement was not mitigated by "overwhelming" evidence);
*Jefferson v. State* (Ark. 2004) 198 S.W.3d 527, 537 ("We do not agree with the
State's contention that even if [the accomplice]'s statement was excluded, there
was still overwhelming evidence that Jefferson actively participated in the
crimes"); *Morten v. U.S.* (D.C. 2004) 856 A.2d 595, 602 (reversing the judgment
"[b]ecause the jury may well have accepted the prosecutor's entreaty to consider
the hearsay statements as proof that appellants had conspired to commit murder");
*Hamilton v. State* (Ga.Ct.App. 1982) 292 S.E.2d 473, 474 (reversing the judgment,
even though the accomplice's statement was "ambiguous"); *People v. Addison*
(Ill.App.Ct. 1992) 603 N.E.2d 19, 25 (reversing the judgment even though "the
evidence properly admitted against Addison amply supports his conviction for
murder"); *State v. Jefferson* (Iowa 1997) 574 N.W.2d 268, 276 (reversing the
judgment, even though "the untainted evidence against Jefferson was abundant,"
because the issue of identity "was hotly contested at trial"); *Lowe v. Com.*
(Ky.Ct.App. 1972) 487 S.W.2d 935, 936 (reversing the judgment where the
accomplice's statement was neither "insignificant" nor the "other evidence of
Lowe's guilt so overwhelming"); *People v. Banks* (Mich. 1991) 475 N.W.2d 769,
778 ("[t]he testimony of the [decedent's] three companions, while damaging to the
defendant, would have born considerably less weight in the context of the
defendant's defense of misidentification, without the accusations of defendant by
[his accomplices]"); *State v. Alvarez-Lopez* (N.M. 2004) 98 P.3d 699, 709-711;
*State v. Jackson* (S.C.Ct.App. 2014) 765 S.E.2d 841, 854 (reversing the judgment
because "we do not believe this 'properly admitted evidence of guilt is so
overwhelming, and the prejudicial effect of the codefendant's admission is so
insignificant by comparison,' " — even though "the remaining evidence tending to
establish Jackson's guilt is strong"); *Evans v. State* (Tex.Crim.App. 1976) 534
S.W.2d 707, 710-711; *Rankins v. Com.* (Va.Ct.App. 2000) 523 S.E.2d 524, 534
(reversing the judgment because "the evidence of appellant's guilt, other than [the
accomplice]'s statement, was not overwhelming").

reasonable doubt, the error's effect on the penalty determination does not turn on whether the remaining evidence overwhelmingly established that Penunuri was the shooter or that the statement was cumulative of other, properly admitted evidence. The decision whether to sentence a defendant to death or to life in prison is a normative conclusion about the penalty appropriate for the individual defendant. (See *People v. Jones* (2012) 54 Cal.4th 1, 75.) Accordingly, the People bear the burden to show that there is no reasonable (i.e., realistic) possibility that the jury would have rendered a different verdict in the absence of the error. (See *People v. Grimes*, *supra*, 1 Cal.5th at p. 721; *People v. Neal* (2003) 31 Cal.4th 63, 86.) This is a heavy burden, and rightly so. A death judgment may be upheld *only* if we can say "that the 'verdict actually rendered in *this* trial was surely unattributable' " to the error. (*Neal*, at p. 87.)

Since 1976, the United States has carried out more than 1,400 executions; fewer than 1.5 percent involved a capital defendant who did not actually kill.[4] The odds that this particular jury would have sentenced Penunuri to death are likely even lower. A review of what the jury actually weighed on the issue of penalty " ' "as revealed in the record" ' " shows why. (*People v. Pearson*, *supra*, 56 Cal.4th at p. 463.) In arguing for the ultimate penalty, the prosecution repeatedly emphasized Penunuri's role as the triggerman and the manner in which the triggerman carried out the Molina and Murillo murders. A "significant factor in aggravation," according to the prosecutor was "the way" the Molina and Murillo murders were "carried out": "It was brutal, it was merciless, and it was

---

**4** (See Death Penalty Information Center, Executions by Year (2018) <http://www.deathpenaltyinfo.org/executions-year> [as of May 31, 2018]; *id.*, Those Executed Who Did Not Directly Kill the Victim (2018) <www.deathpenaltyinfo.org/those-executed-who-did-not-directly-kill-victim> [as of May 31, 2018].) These internet citations are archived by year, docket number, and case name at <http://www.courts.ca.gov/38324.htm>.

17

unforgivable the way that Mr. Penunuri shot those boys while they slept. Didn't give them any chance or opportunity to either plea for their [lives], defend themselves, or inform Dozer of any reason why they should not be killed." The prosecutor added that the "number" and "location" of their gunshot wounds "tell us how brutal and how merciless those killings[s] were. And those are factors in aggravation that you can take into consideration." The prosecutor then relied on the sequence of shots to argue that Penunuri shot Molina to eliminate a witness to the Murillo murder, and proposed that the jury consider that "as another example of a significant substantial factor in aggravation."

True: Penunuri's death sentence would have been sufficiently justified by the witness-killing special circumstance related to the Castillo murder. Yet the question for us is not whether a jury *could have* sentenced Penunuri to death, but whether there is a reasonable doubt that *this* jury would have done so in the absence of the error. Time and again, the prosecutor highlighted Penunuri's role in the Molina and Murillo murders at the expense of the Castillo murder, which he did not personally commit, and for which he was not even present.

For example, the prosecutor warned that to sentence Penunuri to life in prison without the possibility of parole "kind of places him on the same level as an Arthur Bermudez, who was only used as a tool, if you will, to commit [the Castillo] murder without actually being a triggerman in any way, shape, or form. And Dozer deserves a little more than that. A lot more than that. *Because he was actually the triggerman*." Indeed, the prosecutor explicitly argued that Penunuri and Joseph Castro, Jr. (who shot Castillo), should not be sentenced "on the same level as an Arthur Bermudez or an Alejandro Delaloza who are in life in prison for the rest of their [lives]. But those individuals were not the triggerman in these respective cases." Then, referring to Penunuri and Castro, the prosecutor highlighted the contrast: "We have the defendants who are in fact the

18

triggermen." Even if the jury were to disregard the Castillo murder, the robberies, and the other aggravating evidence offered against Penunuri, the prosecution's theory was that "even if we discount all of that, the way that [Molina] died . . . is a factor in aggravation beyond compare which warrants the death penalty in and of itself."

No one can reasonably deny the prosecution's case for death relied substantially on Penunuri's role in the Molina and Murillo murders — a role that, in turn, depended substantially on inferences from Delaloza's unconfronted but incriminating statements. Given the centrality of Penunuri's precise role in those murders, there is no basis for declaring the death verdict " ' "surely unattributable" ' " to the trial court's serious confrontation clause error. (*People v. Grimes*, *supra*, 1 Cal.5th at p. 723.)

So the penalty verdict, like the firearm use enhancement, was based in substantial part on the tainted assumption Penunuri was the triggerman. I would reverse both and remand for further proceedings. (See *People v. Jackson* (1967) 67 Cal.2d 96, 100.) The court's decision to affirm these aspects of the judgment is a product of its failure to apply our harmless error test correctly. With respect, I dissent.

**CUÉLLAR, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Penunuri

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S095076
**Date Filed:** May 31, 2018

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Robert W. Armstrong

_____

**Counsel:**

Stephen M. Lathrop, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Joseph P. Lee and E. Carlos Dominguez, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Stephen M. Lathrop
Law Offices of Lathrop & Villa
904 Silver Spur Road, #430
Rolling Hills Estates, CA  90274
(310) 237-1000

E. Carlos Dominguez
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA  90013
(213) 269-6120