Filed 10/14/20  P. v. Diego CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B297572 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA145189-02) |
| v. | |
| SAMUEL DIEGO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, John J. Lonergan, Jr., Judge.  Affirmed in part and reversed in part.

Johanna Pirko, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., Supervising Deputy Attorney General, and Stacy S. Schwartz, Deputy Attorney General, for Plaintiff and Respondent.

Samuel Diego was convicted by a jury of second degree robbery and grand theft of a firearm after he and his brother Fredy Diego attacked Edwin Jimenez, a security guard at a Metro station, and fled with Jimenez's gun. On appeal Samuel contends there was insufficient evidence to support his convictions as an aider and abettor of the theft offenses because he was unconscious when Fredy took the gun and, in any event, his conviction for grand theft must be reversed because it is a lesser included offense of robbery. We agree with Samuel's second argument, as does the Attorney General, but not his first, and affirm the judgment in part.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The Amended Information and Trial*

Samuel was charged in an amended information with attempted willful, deliberate and premeditated murder (Pen. Code, §§ 187, subd. (a), 664)[1] (count 1); second degree robbery (§ 211) (count 2); and grand theft of a firearm (§ 487, subd. (d)(2)) (count 3). The amended information specially alleged Samuel had previously suffered a serious or violent felony conviction within the meaning of the three strikes law (§ 667, subds. (b)-(j)), and a serious felony conviction under section 667, subdivision (a), and had served a prior prison term for a violent felony conviction within the past 10 years pursuant to section 667.5, subdivision (a).[2]

---

[1] Statutory references are to this code.

[2] In addition, the amended information specially alleged, with respect to the attempted murder count, Samuel had personally used and intentionally discharged a firearm within the meaning of section 12022.53, subdivisions (b) and (c), and,

According to his testimony at trial, Jimenez was working on October 26, 2017 as a security officer at the 103rd Street and Graham Avenue Metro Blue Line stop. Both Jimenez and his partner were armed. Jimenez had secured his firearm, an XD .40 caliber gun, in a locked holster attached to his gun belt on the right side of his waist.

Sometime after 10:20 p.m. Jimenez saw two groups of men disembark from a train. The two men in one group, Samuel and Fredy, initially caught his attention because they were drinking alcohol. They threw gang signs, asked the four men in the other group what gang they were from and showed their tattoos. The men in both groups became verbally aggressive and started shouting. Jimenez approached them and said, if they were going to fight, they had to leave the station. The two groups left the Metro station platform together.

Thirty seconds later Jimenez heard shouting and the breaking of a glass bottle. He saw Samuel and Fredy get in a physical altercation with the other four men, who later ran toward the ramp leading up from the sidewalk to the Metro station platform. Jimenez, standing at the ramp's main entrance, told them they could not reenter; the men acquiesced and returned to the sidewalk, where they got into another altercation with Samuel and Fredy.

The Diego brothers then tried to come up the ramp. When Jimenez denied Samuel and Fredy reentry to the platform, Fredy punched Jimenez in the face with a closed fist. Jimenez started to punch Fredy back. The fight continued; and five seconds later

with respect to all counts, the offenses had been committed for the benefit of a criminal street gang (§ 186.22, subd. (b)).

3

Samuel joined in, punching Jimenez in the back of his head. Before the Diego brothers attacked him, Jimenez had not used physical force against them.

The fight moved onto the sidewalk. Jimenez used pepper spray against the brothers, who became more aggressive. Both Fredy and Samuel were punching Jimenez, who was trying to fight back. Fredy at some point was knocked to the ground when Jimenez punched him. Jimenez believed Fredy passed out because he was on the ground for a couple of seconds, but Jimenez was unable to go to Fredy to confirm he was unconscious. After he knocked down Fredy, Jimenez turned around to his left to try to address Samuel, who was attacking him. In the process Jimenez tripped on the curb. When he fell, he went into a "crawl position," with his knees and palms on the floor. Samuel was behind him to his left. Fredy was lying on the ground to his right.

As Jimenez tried to get up, he felt a kick to his back. He tried again to rise; but, as he did, Samuel began kicking his head. Jimenez explained he knew it was Samuel because Samuel was to his left and Fredy "was barely getting up." Jimenez once again tried to get up. At this point Fredy grabbed for Jimenez's weapon. Jimenez felt Fredy pulling his weapon two or three times before Fredy succeeded in taking it. Jimenez, who by this time had been lying on his stomach, rolled onto his back and saw Fredy holding the gun. Fredy lowered and fired it at Jimenez's face. As Jimenez rolled to his left to avoid being struck by a bullet, he heard the discharge of the gun. He rolled again, jumped up and ran to his partner. Fredy and Samuel fled the scene.

When Jimenez looked for his gun, it was not on the ground where the incident had taken place. Later Jimenez noticed his uniform had blood stains and a bullet hole.

Los Angeles Police Detective Rene Castro testified he had interviewed Samuel and Fredy after they were identified.[3] Fredy told Castro he recalled an incident in October 2017 when he and his brother had left the train at the 103rd Street stop and then "got into it with some guys." Explaining he had picked up a gun that had been dropped by "this guy [who had] fall[en] down out of nowhere," Fredy admitted he had fired the gun (albeit to the side "in[to] the floor"), taken off with it and sold it.

Detective Castro testified he had searched, with Fredy's permission, Fredy's cellphone and found photographs of Fredy holding a gun. One photograph, admitted in evidence, showed the marking "XD 40" on the gun's slide. Jimenez identified the weapon depicted as the one he used as a security officer, with the same color and caliber.

2. *The Verdict and Sentencing*

The jury found Samuel not guilty of attempted murder but guilty of second degree robbery and grand theft of a firearm.[4] After Samuel admitted his 2013 conviction for robbery, the court sentenced him as a second strike offender to six years in state prison (the middle term of three years for second degree robbery,

---

[3] The transcript of Fredy's interview was admitted into evidence.

[4] The jury also found Samuel not guilty of attempted voluntary manslaughter as a lesser included offense to attempted murder and found not true the criminal street gang enhancement allegations.

doubled).  The court stayed the sentence for the conviction of grand theft of a firearm.[5]

## DISCUSSION

1.  *Governing Law and Standard of Review*

    a.  *Robbery*

Robbery is defined as "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear."  (§ 211.)  "A conviction of robbery requires evidence showing that the defendant conceived the intent to steal either before or during the commission of the act of force against the victim.  [Citation.]  '"[I]f the intent arose only after the use of force against the victim, the taking will at most constitute a theft."'"  (*People v. Jackson* (2016) 1 Cal.5th 269, 343.)  "'[T]he crime of robbery is a continuing offense that begins from the time of the original taking until the robber reaches a place of relative safety.'"  (*People v. Anderson* (2011) 51 Cal.4th 989, 994.)

    b.  *Grand theft*

"Every person who shall feloniously steal, take, carry, lead, or drive away the personal property of another . . . is guilty of theft."  (§ 484, subd. (a).)  Theft committed when the property taken is a firearm constitutes grand theft.  (§ 487, subd. (d)(2).)

    c.  *Aider-and-abettor liability*

"'A person aids and abets the commission of a crime when he or she, (i) with knowledge of the unlawful purpose of the

---

[5]    The court at sentencing did not mention the section 667, subdivision (a), and section 667.5, subdivision (a), enhancement allegations.

6

perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime.'" (*People v. Delgado* (2013) 56 Cal.4th 480, 486.) "[I]f a person in fact aids, promotes, encourages or instigates commission of a crime, the requisite intent to render such aid must be formed *prior to or during* 'commission' of that offense." (*People v. Cooper* (1991) 53 Cal.3d 1158, 1164.)  "For purposes of determining aider and abettor liability, the commission of a robbery continues until all acts constituting the offense have *ceased*." (*Ibid*.)

### d.    *Substantial evidence review*

In considering a claim of insufficient evidence in a criminal case, "'we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt. [Citation.]  The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citation.]  In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence.  [Citation.]  "Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.  [Citation.]  We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.

[Citation.]" [Citation.] A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support'" the jury's verdict.'" (*People v. Penunuri* (2018) 5 Cal.5th 126, 142; accord, *People v. Zamudio* (2008) 43 Cal.4th 327, 357; see *People v. Westerfield* (2019) 6 Cal.5th 632, 713.)

    2.   *Substantial Evidence Supports Samuel's Convictions*

Relying on statements Jimenez made in an interview with Detective Castro indicating it was Samuel, not Fredy, who had been knocked unconscious during the altercation, Samuel contends the evidence is insufficient to support his convictions.[6] If he was unconscious, he argues, he could not have had the requisite knowledge and intent to aid Fredy's theft of the gun; and there was no evidence Samuel became aware Fredy had stolen the weapon after regaining consciousness.

At trial, however, Jimenez testified he was certain it was Fredy whom he had knocked unconscious. He explained he was in shock after the incident. His recall of the events was now clearer than it had been. In describing the incident Jimenez testified he had knocked Fredy down and Fredy was lying on the ground to his right for a couple of seconds. That description is fully consistent with Jimenez's testimony Fredy then made a

---

[6]    In the recorded interview, which was played for the jury, Jimenez said the individual he punched and knocked unconscious had a tattoo by his left eye and was wearing a "Hustler" shirt. At trial Jimenez confirmed that Samuel had such a tattoo and that the surveillance video from the day of the incident showed Samuel wearing that shirt.

grab for his weapon at his right hip while Jimenez lay on his stomach.

Jimenez's trial testimony unquestionably constituted sufficient evidence to support Samuel's convictions. Evaluating the credibility of that testimony in light of the inconsistent statements made during Jimenez's police interview was a matter for the jury, not this court when reviewing the jury's verdict. (See, e.g., *People v. Gomez* (2018) 6 Cal.5th 243, 309 ["'[i]n deciding the sufficiency of the evidence, a reviewing court resolves neither credibility issues nor evidentiary conflicts'"]; *People v. Penunuri, supra,* 5 Cal.5th at p. 142 ["''[c]onflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment'''"]; *People v. Brooks* (2017) 3 Cal.5th 1, 57-58 ["[a]lthough the scenario defendant describes appears plausible, this court's role on review does not involve a reevaluation of the evidence"].)

### 3. *The Conviction for Grand Theft of a Firearm Must Be Reversed*

Samuel asserts, and the Attorney General concedes, that grand theft of a firearm is a lesser included offense of robbery. (See *People v. Ortega* (1998) 19 Cal.4th 686, 699 [reaffirming "the well-established rule that a defendant may not be convicted of both robbery and grand theft based upon the same conduct" because "[t]heft, in whatever form it happens to occur, is a necessarily included offense of robbery"].) Accordingly, the conviction on count 3 must be reversed. (See *People v. Sanders* (2012) 55 Cal.4th 731, 736 ["[w]hen a defendant is found guilty of both a greater and a necessarily lesser included offense arising out of the same act or course of conduct, and the evidence supports the verdict on the greater offense, that conviction is

9

controlling, and the conviction of the lesser offense must be reversed"]; *People v. Milward* (2011) 52 Cal.4th 580, 589 [same].)

## DISPOSITION

The conviction for grand theft of a firearm is reversed, and the sentence for that charge, stayed pursuant to section 654, is vacated.  In all other respects the judgment is affirmed.  The trial court is to prepare a corrected abstract of judgment reflecting these changes and forward it to the Department of Corrections and Rehabilitation.

PERLUSS, P. J.

We concur:

FEUER, J.

RICHARDSON, J.*

---

\* Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.